UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MAGISTRATE JUDGE

CENTER CAPITAL CORPORATION,

        Plaintiff,

    v.

AERO REALTY TRUST and JEFFREY S.
GOLDBERG, Individually and as Trustee
of Aero Realty Trust

        Defendant.

Case No.

RECEIPT #
AMOUNT $ 150
SUMMONS ISSUED yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK
DATE

## COMPLAINT FOR MONEY DAMAGES

NOW COMES Plaintiff CENTER CAPITAL CORPORATION ("CENTER CAPITAL"), for

its Complaint for Money Damages against AERO REALTY TRUST ("AERO REALTY") and

JEFFREY S. GOLDBERG ("GOLDBERG"), and states as follows:

### PARTIES

1.    CENTER CAPITAL is a Connecticut corporation with its principal place of business

at 3 Farm Glen Boulevard, Farmington, Connecticut 06032.

2.    AERO REALTY is a Massachusetts Trust holding real and personal property and

rights relating to such property, transferred to GOLDBERG as Trustee of AERO REALTY. The

"Declaration of Trust of Aero Realty Trust" attached hereto as Exhibit A was recorded as Document

BK02443PG207 on September 22, 1993 in the Worcester County North District Registry of Deeds.

The principal place of business of AERO REALTY is 163 Pioneer Drive, Leominster,

Massachusetts 01453. AERO REALTY is a citizen of Massachusetts.

3.    GOLDBERG is a resident and citizen of Massachusetts with an address of 20

Montrose Street, Newton, Massachusetts 02458.

4.    Non-party AERO PLASTICS, INC. ("AERO PLASTICS") is a Massachusetts corporation with a principal place of business at 163 Pioneer Drive, Leominster, Massachusetts 01453. AERO PLASTICS filed a Chapter 11 Petition on January 6, 2005 in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, as Case No. 05-60451-MHM.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this matter based upon diversity of citizenship pursuant to 28 U.S.C. Section 1332(a) because the amount in controversy exceeds $75,000.00 exclusive of interest and costs and this controversy is between citizens of different states.

6.    Venue is appropriate in this Court pursuant to 28 U.S.C. 1391(a) (1) and (2).

## FACTS

7.    Key Equipment Finance, a division of Key Corporate Capital Inc. ("KEY"), as lessor, and AERO PLASTICS as lessee entered into Master Equipment Lease Agreement dated as of November 6, 2002. See Exhibit B. See also Amendment No. 1 to Master Equipment Lease Agreement and Amendment No. 2 to Master Equipment Lease Agreement, attached, respectively, as Exhibits C and D.

8.    KEY entered into a Lease Origination Agreement on or about December 19, 2002 with CENTER CAPITAL, as a buyer. See Exhibit E.

9.    CENTER CAPITAL as lessor and AERO PLASTICS as lessee entered into Equipment Schedule No. 2 dated as of December 2, 2002 pursuant to the Master Lease Agreement dated as of November 6, 2002. See Exhibit F.

10.    GOLDBERG, individually, executed a Personal Guaranty to "absolutely unconditionally and irrevocably" guarantee to KEY "the full and prompt payment and performance by lessee of all obligations..." See Exhibit G.

2

11.     AERO REALTY executed a Corporate Guaranty to "absolutely unconditionally and irrevocably" guarantee to KEY "the full and prompt payment and performance by lessee of all obligations..." See Exhibit H.

12.     GOLDBERG entered into a Subordination Agreement dated as of November 6, 2002 for the benefit of KEY. See Exhibit I.

13.     AERO PLASTICS executed a "Lessee Acknowledgment (Certificate of Acceptance)" dated December 20, 2002. See Exhibit J.

14.     A "Notice and Acknowledgment of Assignment" directed to CENTER CAPITAL (referencing the assignment of the Master Equipment Lease Agreement dated as of November 6, 2002; the Corporate Guaranty of AERO REALTY dated December 18, 2002; and the Personal Guaranty of GOLDBERG dated as of November 8, 2002) was executed by KEY, AERO PLASTICS, AERO REALTY, and GOLDBERG. See Exhibit K.

15.     A "Third Amendment and Restatement of Lease Agreement" was executed effective September 30, 2004 by CENTER CAPITAL, AERO PLASTICS, GOLDBERG and AERO REALTY. See Exhibit L.

16.     A prophylactic Financing Statement was filed with the Massachusetts Secretary of State setting forth the first priority secured purchase money security interest of CENTER CAPITAL in the equipment financed by CENTER CAPITAL.

**COUNT I**
**MONEY DAMAGES FOR BREACH OF CONTRACT AGAINST AERO REALTY**

17.     CENTER CAPITAL realleges and restates Paragraphs 1 through 16 as though fully set forth in Paragraph 17 of Count I of its Complaint.

3

18.    An event of default is defined at paragraph 22 of the Master Equipment Lease Agreement to include a petition being "filed by or against lessee or any guarantor under any bankruptcy, insolvency or similar legislation..."

19.    CENTER CAPITAL has performed all of its obligations under Master Equipment Lease Agreement and Equipment Schedule No. 2 thereto.

20.    AERO PLASTICS defaulted under Equipment Schedule No. 2 by its failure to make payment in the amount of $12,212.42 due on January 1, 2005 and all payments due thereafter under Equipment Schedule No. 2. The present value of the 50 payments to become due after the January 1, 2005 payment is $719,768.66 using a discount rate of 3%. Thus, the total discounted balance due is $731,981.08.

21.    Miscellaneous repossession expenses are $300.00.

22.    Late charges are $625.00.

23.    Interest accrues on the discounted balance of $731,981.08 at the pre-judgment rate of 18% from the date of acceleration of January 6, 2005 until the date of judgment.

24.    Pursuant to the Master Equipment Lease Agreement, in the event of default, CENTER CAPITAL is entitled to its "reasonable legal fees and other costs and expenses incurred by reason of the occurrence of any event of default or the exercise of lessor's remedies with respect thereto."

## COUNT II
## BREACH OF GUARANTY AGAINST GOLDBERG, INDIVIDUALLY AND AS TRUSTEE

25.    CENTER CAPITAL realleges and restates Paragraphs 1 through 24 as though fully set forth in Paragraph 25 of Count II of its Complaint.

WHEREFORE, CENTER CAPITAL respectfully requests that this honorable Court enter judgment in its favor and against AERO REALTY and GOLDBERG, jointly and severally as follows:

a)    For damages in the amount of a discounted balance of $731,981.08, plus miscellaneous repossession expenses, plus late charges, plus pre-judgment interest, plus reasonable attorney fees and costs;

b)    In addition, CENTER CAPITAL is also entitled to the value of the residual interest in the collateral; and

c)    For such other and further relief as this Court deems just.

**CENTER CAPITAL CORPORATION**

**BY ITS ATTORNEYS,**

NELSON, KINDER, MOSSEAU & SATURLEY,  PC

By:    _____
        Frank W. Beckstein III
        BBO# 035280
        Nelson, Kinder, Mosseau & Saturley, PC
        45 Milk St., 7th Floor
        Boston, MA 02109

"A"

JHN-25-2005  12:34    CENTER CAPITAL                  860 677 1888    P.05
12/10/2002 16:40 FAX 318487476'        KEY EQUIPMENT FINANCE NV              Ø002

BK 0 2 4 4 3 PG 2 0 7

## DECLARATION OF TRUST OF
## AERO REALTY TRUST

1.      I, Jeffrey S. Goldberg, of Newton Centre, Massachusetts, hereby declare that I
and my successors in trust (collectively, the "Trustee") will hold any and all real and
personal property and rights relating to such property transferred to him as Trustee hereunder
(the "trust property") for the sole benefit of the Beneficiaries (as defined below) upon the
following terms. This trust shall be designated the Aero Realty Trust.

2.      Except as provided below in case of the termination of the trust, the Trustee
shall have no power to deal in or with the trust property except as directed by the Benef-
iciaries. When and as directed by the Beneficiaries, however, the Trustee shall have full
power and authority to borrow money and to execute and deliver notes or other evidence of
such borrowing; to sell, assign, mortgage, or otherwise dispose of all or any part of the trust
property and to lease all or any part thereof by one or more leases for a term or terms which
may extend beyond the date of any possible termination of the trust; to grant or acquire
rights or easements and enter into agreements or arrangements with respect to the trust
property; to retain attorneys, accountants and other agents and to pay them compensation for
their services and to delegate to them ministerial or discretionary powers; and to deal
generally with the trust property on behalf of the Beneficiaries. Notwithstanding the
foregoing, no Trustee shall be required to take any action which may in the opinion of such
Trustee involve the Trustee in any personal liability unless first indemnified to his or her
satisfaction.

3.      The terms "Beneficiary" or "Beneficiaries" shall mean the beneficiary or
beneficiaries listed on a schedule of beneficial interests setting forth their respective interests,
counterparts of which are executed by all the Beneficiaries and filed with the Trustee, or on
any amendment thereto filed with the Trustee. Except as otherwise provided herein or by
law, any actions to be taken hereunder by the Beneficiaries shall require the consent of the
holders of all of the beneficial interests hereunder. No assignment or transfer of any
beneficial interest may be made without the written consent of all the Trustees and all of the
Beneficiaries hereunder. The Trustee shall not be affected by any assignment or transfer of
any beneficial interest until receipt by the Trustee of satisfactory written evidence of such
assignment or transfer and until an amended schedule of beneficial interests shall have been
duly executed by the assignee or transferee and filed with the Trustee. Upon the death or
incapacity of a Beneficiary, his or her legal representative or successor-in-interest shall be
entitled to exercise all the rights of such Beneficiary. Any Trustee may become a
Beneficiary and exercise all rights of a Beneficiary hereunder with the same effect as though
he or she were not a Trustee.

4.      Neither the Trustee nor the Beneficiaries shall be held personally liable as
copartners or otherwise. The purpose of this trust is to be a title-holding agency.

5.      This trust may be amended from time to time by an instrument in writing
signed by all the then Trustees and Beneficiaries, and acknowledged by one or more of them,

93 SEP 22 PM 1:19

EXHIBIT

A

JAN-25-2005  12:55    CENTER CAPITAL                    860 677 1888    P.06
12/10/2002 16:41 FAX 518487476·         KEY EQUIPMENT FINANCE NV              ☑003

BK02443PG208

provided in each case that the instrument of amendment or a certificate signed by any Trustee setting forth the terms of such amendment shall be recorded with Registry of Deeds designated below. The trust may be terminated at any time by all of the Beneficiaries by notice in writing to the Trustee; or by the Trustee upon notice in writing to all of the Beneficiaries; provided that in either event, no such termination shall be effective until a certificate thereof signed by the Trustee shall be recorded with the Registry. In all events, this trust shall terminate upon the sale of substantially all the trust property or eighty-nine (89) years from the date of the creation of the trust. In case of any such termination, the Trustee shall transfer and convey the entire trust property, subject to any leases, mortgages, contracts, or other encumbrances, to the Beneficiaries as tenants in common in proportion to their respective interests.

6.     Any Trustee hereunder may resign by written instrument signed and acknowledged by such Trustee and recorded with the Worcester County North District Registry of Deeds. Succeeding or additional Trustees may be appointed or any Trustee removed by an instrument or instruments in writing signed by the Beneficiaries and acknowledged by one or more of them, provided that in each case such instrument or instruments or a certificate by any Trustee naming the Trustee or Trustees appointed or removed, and in the case of an appointment, the acceptance in writing by the Trustee or Trustees appointed, shall be so recorded. Notwithstanding the foregoing, only one Trustee is required to serve at any one time. Upon the appointment of any succeeding or additional Trustee, title to the trust property shall be vested in such succeeding or additional Trustee jointly with the remaining Trustee, if any, without the necessity of any conveyance. Any succeeding or additional Trustee shall have all the rights, powers, authority and privileges as if named as an original Trustee. No Trustee shall be required to furnish bond or sureties.

7.     Any one Trustee may exercise the powers of all Trustees. A Trustee shall not be liable for any action taken at the direction of the Beneficiaries, nor for any error of judgment nor for any loss arising out of any act or omission in the execution of the trust so long as he or she acts in good faith, but shall be responsible only for his or her own willful breach of trust. No license of court shall be requisite to the validity of any transaction entered into by the Trustee, and the Trustee shall have full power and authority to execute all deeds and other instruments necessary or proper to carry such transactions into effect. The Trustee's authority shall survive the death or disability of any Beneficiary. No purchaser or lender shall be under any liability to see to the application of purchase money or of any money or property loaned or delivered to the Trustee or to see that the terms and conditions of this trust have been complied with. Every instrument executed by a person who according to the records in the Worcester County North District Registry of Deeds appears to be a Trustee hereunder shall be conclusive evidence in favor of every person relying thereon or claiming thereunder that at the time of the delivery thereof this trust was in full force and effect and that the Trustee was duly directed by the Beneficiaries to execute and deliver the same. Any person dealing with the trust property or the Trustee may always rely without further inquiry on a certificate signed by a person appearing from the records in the Worcester County North District Registry of Deeds to be a Trustee hereunder as to whether or not this trust has been terminated or amended, as to the identity of the Trustees or the Beneficiaries hereunder, or as to the existence or nonexistence of any fact or facts which

- 2 -

JAN-25-2005  12:35        CENTER CAPITAL                      860 677 1888     P.07
12/10/2002 16:41 FAX 3164074763       KEY EQUIPMENT FINANCE NY                    004

BK 0 2 4 4 3 PG 2 0 9

constitute conditions precedent to acts by the Trustees or are in any other manner germane to the affairs of the trust.

8.    All persons extending credit to or contracting with or having any claim against the Trustee shall look only to the trust property for any such contract or claim, and neither the Trustee nor any Beneficiary shall be personally liable therefor. Any instrument creating liability executed by a Trustee shall expressly stipulate that the trust property only, and not the Trustees or the Beneficiaries individually, shall be liable for satisfaction of any obligation thereunder. If any Trustee shall at any time for any reason (other than for willful breach of trust) be held to be under any personal or individual liability as such Trustee, then such Trustee shall be held harmless and indemnified by the Beneficiaries jointly and severally, against all loss, costs, damage or expense by reason of such liability. In the event of any liability of a Trustee that is a corporation, in no such circumstances shall such liability impose liability on any shareholder, member, officer, director, employee, agent, contractor or other representative of such corporation and the Beneficiaries shall indemnify such person or entity against and from any and all loss, costs, damage or expense by reason of such liability.

9.    This Declaration of Trust shall be construed in accordance with the laws of the Commonwealth of Massachusetts.

Executed under seal as of the _13th_ _____ day of _July_____, 1993.

_Jeffrey S. Goldberg_
Jeffrey S. Goldberg, Trustee

## COMMONWEALTH OF MASSACHUSETTS

Worcester
~~Suffolk~~, ss.

On this 21st day of _September_, 1993, before me personally appeared Jeffrey S. Goldberg, as Trustee of Aero Realty Trust, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed as Trustee of Aero Realty Trust.

Notary Public
My commission expires: Nov. 1, 1996

ATTEST-WORCESTER COUNTY NORTHERN DISTRICT
JOHN B. McLAUGHLIN, REGISTER

- 3 -

"B"



C# 54474
L#: 54475

# Master Equipment Lease Agreement

THIS MASTER EQUIPMENT LEASE AGREEMENT dated as of November 6, 2002 is made by and between **Key Equipment Finance, a Division of Key Corporate Capital Inc.**, having an address at 66 South Pearl Street, Post Office Box 1865, Albany, NY 12207-1865 ("Lessor"), and AERO PLASTICS, INC , a Massachusetts corporation with its principal place of business at 163 Pioneer Drive, Leominster, MA 01453 ("Lessee")

## TERMS AND CONDITIONS OF LEASE

1.     **Lease.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Equipment, subject to and upon the terms set forth herein Each Equipment Schedule shall constitute a separate and enforceable lease incorporating all the terms of this Master Equipment Lease Agreement as if such terms were set forth in full in such Equipment Schedule In the event that any term of any Equipment Schedule conflicts with or is inconsistent with any term of this Master Equipment Lease Agreement, the terms of the Equipment Schedule shall govern

2.     **Disclaimer of Warranties.** LESSOR MAKES NO (AND SHALL NOT BE DEEMED TO HAVE MADE ANY) WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN, OPERATION OR CONDITION OF, OR THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN, THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, THE STATE OF TITLE THERETO OR OF ANY COMPONENT THEREOF, THE ABSENCE OF LATENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), AND LESSOR HEREBY DISCLAIMS THE SAME; IT BEING UNDERSTOOD THAT THE EQUIPMENT IS LEASED TO LESSEE "AS IS" AND ALL SUCH RISKS, IF ANY, ARE TO BE BORNE BY LESSEE. NO DEFECT IN, OR UNFITNESS OF, THE EQUIPMENT, OR ANY OF THE OTHER FOREGOING MATTERS, SHALL RELIEVE LESSEE OF THE OBLIGATION TO PAY RENT OR OF ANY OTHER OBLIGATION HEREUNDER. LESSEE HAS MADE THE SELECTION OF THE EQUIPMENT FROM THE SUPPLIER BASED ON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY LESSOR. LESSOR IS NOT RESPONSIBLE FOR ANY REPAIRS, SERVICE, MAINTENANCE OR DEFECT IN THE EQUIPMENT OR THE OPERATION THEREOF. IN NO EVENT SHALL LESSOR BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES (WHETHER UNDER THE UCC OR OTHERWISE), INCLUDING, WITHOUT LIMITATION, ANY LOSS, COST OR DAMAGE TO LESSEE OR OTHERS ARISING FROM ANY OF THE FOREGOING MATTERS, INCLUDING, WITHOUT LIMITATION, DEFECTS, NEGLIGENCE, DELAYS, FAILURE OF DELIVERY OR NON-PERFORMANCE OF THE EQUIPMENT. ANY WARRANTY BY THE SUPPLIER IS HEREBY ASSIGNED TO LESSEE BY LESSOR FOR THE TERM OF THE LEASE WITHOUT RECOURSE. SUCH WARRANTY SHALL NOT RELEASE LESSEE FROM ITS OBLIGATION TO LESSOR TO PAY RENT, TO PERFORM ALL OTHER OBLIGATIONS HEREUNDER AND TO KEEP, MAINTAIN AND SURRENDER THE EQUIPMENT IN THE CONDITION REQUIRED BY SECTIONS 12 AND 13 HEREOF. Lessee's execution and delivery of a Certificate of Acceptance shall be conclusive evidence as between Lessor and Lessee that the Items of Equipment described therein are in all of the foregoing respects satisfactory to Lessee, and Lessee shall not assert any claim of any nature whatsoever against Lessor based on any of the foregoing matters, provided, however, that nothing contained herein shall in any way bar, reduce or defeat any claim that Lessee may have against the Supplier or any other person (other than Lessor)

3.     **Non-Cancelable Lease.** THIS LEASE IS A NET LEASE AND LESSEE'S OBLIGATION TO PAY RENT AND PERFORM ITS OBLIGATIONS HEREUNDER ARE ABSOLUTE, IRREVOCABLE AND UNCONDITIONAL UNDER ANY AND ALL CIRCUMSTANCES WHATSOEVER (INCLUDING WITHOUT LIMITATION THE BANKRUPTCY OF LESSOR) AND SHALL NOT BE SUBJECT TO ANY RIGHT OF SET OFF, COUNTERCLAIM, DEDUCTION, DEFENSE OR OTHER RIGHT WHICH LESSEE MAY HAVE AGAINST THE SUPPLIER, LESSOR OR ANY OTHER PARTY. LESSEE SHALL HAVE NO RIGHT TO TERMINATE (EXCEPT AS EXPRESSLY PROVIDED HEREIN) OR CANCEL THIS LEASE OR TO BE RELEASED OR DISCHARGED FROM ITS OBLIGATION HEREUNDER FOR ANY REASON WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DEFECTS IN, DESTRUCTION OF, DAMAGE TO OR INTERFERENCE WITH ANY USE OF THE EQUIPMENT



**EXHIBIT**

B

(FOR ANY REASON WHATSOEVER, INCLUDING, WITHOUT LIMITATION, WAR, ACT OF GOD, STRIKE OR GOVERNMENTAL REGULATION), THE INVALIDITY, ILLEGALITY OR UNENFORCEABILITY (OR ANY ALLEGATION THEREOF) OF THIS LEASE OR ANY PROVISION HEREOF, OR ANY OTHER OCCURRENCE WHATSOEVER, WHETHER SIMILAR OR DISSIMILAR TO THE FOREGOING, WHETHER FORESEEN OR UNFORESEEN.

4.    **Definitions.** Unless the context otherwise requires, as used in this Lease, the following terms shall have the respective meanings indicated below and shall be equally applicable to both the singular and the plural forms thereof

"Applicable Law" shall mean all applicable Federal, state, local and foreign laws, ordinances, judgments, decrees, injunctions, writs, rules, regulations, orders, licenses and permits of any Governmental Authority

"Appraisal Procedure" shall mean the following procedure for obtaining an appraisal of the Fair Market Sales Value or the Fair Market Rental Value  Lessor shall provide Lessee with the names of three independent Appraisers  Within ten (10) business days thereafter, Lessee shall select one of such Appraisers to perform the appraisal   The selected Appraiser shall be instructed to perform its appraisal based upon the assumptions specified in the definition of Fair Market Sales Value or Fair Market Rental Value, as applicable, and shall complete its appraisal within twenty (20) business days after such selection   Any such appraisal shall be final, binding and conclusive on Lessee and Lessor and shall have the legal effect of an arbitration award   Lessee shall pay the fees and expenses of the selected Appraiser

"Appraiser" shall mean a person engaged in the business of appraising property who has at least ten (10) years' experience in appraising property similar to the Equipment

"Authorized Signer" shall mean any officer of Lessee, set forth on an incumbency certificate (in form and substance satisfactory to Lessor) delivered by Lessee to Lessor, who is authorized and empowered to execute the Lease Documents

"Certificate of Acceptance" shall mean a certificate of acceptance, in form and substance satisfactory to Lessor, executed and delivered by Lessee in accordance with Section 7 hereof

"Default" shall mean any event or condition which, with the passage of time or the giving of notice, or both, would constitute an Event of Default

"Default Rate" shall mean an annual interest rate equal to the lesser of 18% or the maximum interest rate permitted by Applicable Law

"Equipment" shall mean an item or items of property designated from time to time by Lessee which are described on an Equipment Schedule and which are being or will be leased by Lessee pursuant to this Lease, together with all replacement parts, additions and accessories incorporated therein or affixed thereto including, without limitation, any software that is a component or integral part of, or is included or used in connection with, any Item of Equipment, but with respect to such software, only to the extent of Lessor's interest therein, if any

"Equipment Group" shall consist of all Items of Equipment listed on a particular Equipment Schedule

"Equipment Location" shall mean the location of the Equipment, as set forth on an Equipment Schedule, or such other location (approved in writing by Lessor) as Lessee shall from time to time specify in writing

"Equipment Schedule" shall mean each equipment lease schedule from time to time executed by Lessor and Lessee with respect to an Equipment Group, pursuant to and incorporating by reference all of the terms of this Master Equipment Lease Agreement

"Event of Default" shall have the meaning specified in Section 22 hereof

"Fair Market Rental Value" or "Fair Market Sale Value" shall mean the value of each Item of Equipment for lease or sale, unless otherwise specified herein as determined between Lessor and Lessee, or, if Lessor and Lessee are unable to agree, pursuant to the Appraisal Procedure, which would be obtained in an arms-length transaction between an informed and willing lessor or seller (under no compulsion to lease or sell) and an informed and willing lessee or buyer (under no compulsion to lease or purchase)  In determining the Fair Market Rental Value or Fair Market Sale Value of the Equipment, (a) such Fair Market Rental Value or Fair Market Sale Value shall be calculated on the assumption that the Equipment is in the condition and repair required by Sections 12 and 13 hereof, and (b) there shall be excluded from the calculation thereof the value of any Upgrade made pursuant to Section 14 hereof in which the Lessor does not hold an interest

"GAAP" shall have the meaning specified in Section 31 hereof

"Governmental Action" shall mean all authorizations, consents, approvals, waivers, filings and declarations of any Governmental Authority, including, without limitation, those environmental and operating permits required for the ownership, lease, use and operation of the Equipment

"Governmental Authority" shall mean any foreign, Federal, state, county, municipal or other governmental authority, agency, board or court

"Guarantor" shall mean any guarantor of Lessee's obligations hereunder

"Initial Term Expiration Date" shall have the meaning set forth in the Equipment Schedule associated therewith

"Item of Equipment" shall mean each Item of the Equipment

"Lease", "hereof", "herein" and "hereunder" shall mean, with respect to an Equipment Group, this Master Equipment Lease Agreement and the Equipment Schedule on which such Equipment Group is described, including all addenda attached thereto and made a part thereof

"Lease Documents" shall mean this Lease and all other documents prepared by Lessor and now or hereafter executed in connection therewith

"Lessor Assignee" shall have the meaning specified in Section 15 hereof

"Lessor Expense" shall have the meaning specified in Section 26 hereof

"Lessor Transfer" shall have the meaning specified in Section 15 hereof

"Liability" shall have the meaning specified in Section 24 hereof

"Lien" shall mean all mortgages, pledges, security interests, liens, encumbrances, claims or other charges of any kind whatsoever

"Loss" shall have the meaning specified in Section 16 hereof

"Purchase Agreement" shall mean any purchase agreement or other contract entered into between the Supplier and Lessee for the acquisition of the Equipment to be leased hereunder

"Related Equipment Schedule" shall have the meaning specified in Section 27 hereof

"Remedy Date" shall have the meaning specified in Section 22 hereof

"Rent" shall mean the periodic rental payments due hereunder for the leasing of the Equipment, as set forth on the Equipment Schedules, and, where the context hereof requires, all such additional amounts as may from time to time be payable under any provision of this Lease

"Rent Commencement Date" shall mean, with respect to an Equipment Group, (a) the date on which Lessor receives an executed Certificate of Acceptance for such Equipment from Lessee or (b) the date on which Lessor disburses funds for the purchase of such Equipment Group, as determined by Lessor in its sole discretion

"Rent Payment Date" with respect to an Equipment Group, shall have the meaning set forth in the Equipment Schedule associated therewith

"Required Alteration" shall have the meaning specified in Section 11 hereof

"Stipulated Loss Value" shall mean, as of any Rent Payment Date and with respect to an Item of Equipment, the amount determined by multiplying the Total Cost for such Item of Equipment by the percentage specified in the applicable Stipulated Loss Value Supplement opposite such Rent Payment Date

"Stipulated Loss Value Supplement" with respect to an Equipment Group, shall have the meaning set forth in the Equipment Schedule associated therewith

"Supplier" shall mean the manufacturer or the vendor of the Equipment, as set forth on each Equipment Schedule

"Term" shall mean the Initial Term or any Renewal Term, each as defined in Section 8 hereof, and any Extended Lease Term or Interim Term as defined in an Equipment Schedule

"Total Cost" shall mean, with respect to an Item of Equipment, (a) the acquisition cost of such Item of Equipment (including Lessor's capitalized costs), as set forth on the Equipment Schedule on which such Item of Equipment is described, or (b) if no such acquisition cost is specified, the Supplier's invoice price for such Item of Equipment plus Lessor's capitalized costs, or (c) if no such acquisition cost is specified and no such invoice price is obtainable, an allocated price for such Item of Equipment based on the Total Cost of all Items of Equipment set forth on the Equipment Schedule on which such Item of Equipment is described, as determined by Lessor in its sole discretion

"Upgrade" shall have the meaning specified in Section 14 hereof

5.    Supplier Not an Agent.  LESSEE UNDERSTANDS AND AGREES THAT (a) NEITHER THE SUPPLIER, NOR ANY SALES REPRESENTATIVE OR OTHER AGENT OF THE SUPPLIER, IS (1) AN AGENT OF LESSOR OR (2) AUTHORIZED TO MAKE OR ALTER ANY TERM OR CONDITION OF THIS LEASE, AND (b) NO SUCH WAIVER OR ALTERATION SHALL VARY THE TERMS OF THIS LEASE UNLESS EXPRESSLY SET FORTH HEREIN.

6.    Ordering Equipment.  Lessee has selected and ordered the Equipment from the Supplier and, if appropriate, has entered into a Purchase Agreement with respect thereto  Lessor may accept an assignment from Lessee of Lessee's rights, but none of Lessee's obligations, under any such Purchase Agreement  Lessee shall arrange for delivery of the Equipment so that it can be accepted in accordance with Section 7 hereof  If an Item of Equipment is subject to an existing Purchase Agreement between Lessee and the Supplier, Lessee warrants that such Item of Equipment has not

been delivered to Lessee as of the date of the Equipment Schedule applicable thereto  If Lessee causes the Equipment to be modified or altered, or requests any additions thereto prior to the Rent Commencement Date, Lessee (a) acknowledges that any such modification, alteration or addition to an Item of Equipment may affect the Total Cost, taxes, purchase and renewal options (if any), Stipulated Loss Value and Rent with respect to such Item of Equipment, and (b) hereby authorizes Lessor to adjust such Total Cost, taxes, purchase and renewal options (if any), Stipulated Loss Value and Rent as appropriate  Lessee hereby authorizes Lessor to complete each Equipment Schedule with the serial numbers and other identification data of the Equipment Group associated therewith, as such data is received by Lessor

**7.    Delivery and Acceptance.**  Upon Lessee's acceptance for lease of any Equipment delivered to Lessee and described in any Equipment Schedule, Lessee shall execute and deliver to Lessor a Certificate of Acceptance  LESSOR SHALL HAVE NO OBLIGATION TO ADVANCE FUNDS FOR THE PURCHASE OF THE EQUIPMENT UNLESS AND UNTIL LESSOR SHALL HAVE RECEIVED A CERTIFICATE OF ACCEPTANCE RELATING THERETO EXECUTED BY LESSEE.  Such Certificate of Acceptance shall constitute Lessee's acknowledgment that such Equipment (a) was received by Lessee, (b) is satisfactory to Lessee in all respects and is acceptable to Lessee for lease hereunder, (c) is suitable for Lessee's purposes, (d) is in good order, repair and condition, (e) has been installed and operates properly, and (f) is subject to all of the terms of this Lease (including, without limitation, Section 2 hereof)

**8.    Term; Survival.**  With respect to any Item of Equipment, unless otherwise specified on an Equipment Schedule, the initial term of this Lease (the "Initial Term") shall commence on the date on which such Item of Equipment is delivered to Lessee, and, unless earlier terminated as provided herein, shall expire on the Initial Term Expiration Date for such Item of Equipment  With respect to an Item of Equipment, any renewal term of this Lease (individually, a "Renewal Term"), as contemplated hereby, shall commence immediately upon the expiration of the Initial Term or any prior Renewal Term, as the case may be, and, unless earlier terminated as provided herein, shall expire on the date on which the final payment of Rent is due and paid hereunder  All obligations of Lessee hereunder shall survive the expiration, cancellation or other termination of the Term hereof

**9.    Rent.**  Lessee shall pay the Rent set forth on the Equipment Schedule commencing on the Rent Commencement Date, and, unless otherwise set forth on such Equipment Schedule, on the same day of each payment period thereafter for the balance of the Term  Rent shall be due whether or not Lessee has received any notice that such payments are due  All Rent shall be paid to Lessor at its address set forth on the Equipment Schedule, or as otherwise directed by Lessor in writing

**10.    Location; Inspection; Labels.**  The Equipment shall be delivered to the Equipment Location and shall not be removed therefrom without Lessor's prior written consent  Lessor shall have the right to enter upon the Equipment Location and inspect the Equipment at any reasonable time  Lessor may, without notice to Lessee, remove the Equipment if the Equipment is, in the opinion of Lessor, being used beyond its capacity or is in any manner improperly cared for, abused or misused  At Lessor's request, Lessee shall affix permanent labels indicating Lessor's interest in the Equipment in a prominent place on the Equipment and shall keep such labels in good repair and condition

**11.    Use; Alterations.**  Lessee shall use the Equipment lawfully and only in the manner for which it was designed and intended and so as to subject it only to ordinary wear and tear  Lessee shall comply with all Applicable Law  Lessee shall immediately notify Lessor in writing of any existing or threatened investigation, claim or action by any Governmental Authority in connection with any Applicable Law or Governmental Action which could adversely affect the Equipment or this Lease  Lessee, at its own expense, shall make such alterations, additions or modifications or improvements (each, a "Required Alteration") to the Equipment as may be required from time to time to meet the requirements of Applicable Law or Governmental Action  All such Required Alterations shall immediately, and without further act, be deemed to constitute Items of Equipment and be fully subject to this Lease as if originally leased hereunder, and shall be free and clear of all Liens  Except as otherwise permitted herein, Lessee shall not make any alterations to the Equipment without Lessor's prior written consent

**12.    Repairs and Maintenance.**  Lessee, at Lessee's own cost and expense, shall (a) keep the Equipment in good repair, good operating condition and working order and in compliance with the manufacturer's specifications and Lessee's standard practices (but with respect to the latter, in no event less than industry practices), and (b) enter into and keep in full force and effect during the Term hereof a maintenance agreement with the manufacturer of the Equipment, or a manufacturer-approved maintenance organization, to maintain, service and repair the Equipment as

otherwise required herein. Upon Lessor's request, Lessee shall furnish Lessor with an executed copy of any such maintenance agreement. An alternate source of maintenance may be used by Lessee with Lessor's prior written consent. Lessee, at its own cost and expense and within a reasonable period of time, shall replace any part of any Item of Equipment that becomes unfit or unavailable for use from any cause (whether or not such replacement is covered by the aforesaid maintenance agreement), with a replacement part of the same manufacture, value, remaining useful life and utility as the replaced part immediately preceding the replacement (assuming that such replaced part was in the condition required by this Lease). Such replacement part shall immediately, and without further act, be deemed to constitute an Item of Equipment and be fully subject to this Lease as if originally leased hereunder, and shall be free and clear of all Liens.

**13.    Return of Equipment.** Upon the expiration (subject to Section 32 hereof and except as otherwise provided in an Equipment Schedule) or earlier termination of this Lease, Lessee, at its sole expense, shall assemble and return the Equipment to Lessor by delivering such Equipment F A S or F O B to such location or such carrier (packed for shipping) as Lessor shall specify. Lessee agrees that the Equipment, when returned, shall be in the condition required by Section 12 hereof. All components of the Equipment shall have been properly serviced, following the manufacturer's written operating and servicing procedures, such that the Equipment is eligible for a manufacturer's standard, full service maintenance contract without Lessor's incurring any expense to repair or rehabilitate the Equipment. If, in the opinion of Lessor, any Item of Equipment fails to meet the standards set forth above, Lessee agrees to pay on demand all costs and expenses incurred in connection with repairing such Item of Equipment and restoring it so as to meet such standards. If Lessee fails to return any Item of Equipment as required hereunder, then, all of Lessee's obligations under this Lease (including, without limitation, Lessee's obligation to pay Rent for such Item of Equipment at the rental then applicable under this Lease) shall continue in full force and effect until such Item of Equipment shall have been returned in the condition required hereunder.

**14.    Equipment Upgrades/Attachments.** In addition to the requirements of Section 11 hereof, Lessee, at its own expense, may from time to time add or install upgrades or attachments (each an "Upgrade") to the Equipment during the Term, provided, that such Upgrades (a) are readily removable without causing material damage to the Equipment, (b) do not materially adversely affect the Fair Market Sale Value or attachments (each an "Upgrade") to the Equipment, productive capacity, utility or remaining useful life of the Equipment, and (c) do not cause such Equipment to become "limited use property" within the meaning of Revenue Procedure 76-30, 1976-2 C B 647 (or such other successor tax provision), as of the date of installation of such Upgrade. Any such Upgrades which can be removed without causing damage to or adversely affecting the condition of the Equipment, or reducing the Fair Market Sale Value, the Fair Market Rental Value, residual value, productive capacity, utility or remaining useful life of the Equipment shall remain the property of Lessee, and upon the expiration or earlier termination of this Lease and provided that no Event of Default exists, Lessee may, at its option, remove any such Upgrades and, upon such removal, shall restore the Equipment to the condition required hereunder.

**15.    Sublease and Assignment.** (a) WITHOUT LESSOR'S PRIOR WRITTEN CONSENT, LESSEE SHALL NOT (1) ASSIGN, TRANSFER, PLEDGE, HYPOTHECATE OR OTHERWISE DISPOSE OF THIS LEASE, THE EQUIPMENT OR ANY INTEREST THEREIN, OR (2) SUBLET OR LEND THE EQUIPMENT TO, OR PERMIT THE EQUIPMENT TO BE USED BY, ANYONE OTHER THAN LESSEE.

(b) Lessor, at any time with or without notice to Lessee, may sell, transfer, assign and/or grant a security interest in all or any part of Lessor's interest in this Lease, any Equipment Schedule or any Item of Equipment (each, a "Lessor Transfer"), provided that no such Lessor Transfer will materially increase Lessee's burdens or risks hereunder. In the event of a Lessor Transfer, any purchaser, transferee, assignee or secured party (each a "Lessor Assignee") shall have and may exercise all of Lessor's rights hereunder with respect to the items to which any such Lessor Transfer relates, and LESSEE SHALL NOT ASSERT AGAINST ANY SUCH LESSOR ASSIGNEE ANY DEFENSE, COUNTERCLAIM OR OFFSET THAT LESSEE MAY HAVE AGAINST LESSOR. Lessee acknowledges that no such sale, transfer, assignment and/or security interest will materially change Lessee's duties hereunder or materially increase its burdens or risks hereunder. Lessee agrees that upon written notice to Lessee of any such sale, transfer, assignment and/or security interest, Lessee shall acknowledge receipt thereof in writing and shall comply with the directions and demands of any such Lessor Assignee.

**16.    Risk of Loss; Damage to Equipment.** (a) Lessee shall bear the entire risk of loss (including without limitation, theft, destruction, disappearance of or damage to any and all Items of Equipment ("Loss") from any cause whatsoever),

whether or not insured against, during the Term hereof until the Equipment is returned to Lessor in accordance with Section 13 hereof  No Loss shall relieve Lessee of the obligation to pay Rent or of any other obligation under this Lease

(b) In the event of Loss to any Item of Equipment, Lessee shall immediately notify Lessor of same, and at the option of Lessor, Lessee shall within thirty (30) days following such Loss (1) place such Item of Equipment in good condition and repair, in accordance with the terms hereof, (2) replace such Item of Equipment with replacement equipment (acceptable to Lessor) in as good condition and repair, and with the same value, remaining useful economic life and utility, as such replaced Item of Equipment immediately preceding the Loss (assuming that such replaced Item of Equipment was in the condition required by this Lease), which replacement equipment shall immediately, and without further act, be deemed to constitute Items of Equipment and be fully subject to this Lease as if originally leased hereunder and shall be free and clear of all Liens, or (3) pay to Lessor the sum of (i) all Rent due and owing hereunder with respect to such Item of Equipment (at the time of such payment) plus (ii) the Stipulated Loss Value as of the Rent Payment Date next following the date of such Loss with respect to such Item of Equipment  Upon Lessor's receipt of the payment required under subsection (3) above, Lessee shall be entitled to Lessor's interest in such Item of Equipment, in its then condition and location, "as is" and "where is", without any warranties, express or implied

17.    **Insurance.** (a) Lessee shall, at all times during the Term hereof (until the Equipment shall have been received by Lessor) and at Lessee's own cost and expense, maintain (1) insurance against all risks of physical loss or damage to the Equipment (which shall include theft and collision for Equipment consisting of motor vehicles, but shall not exclude loss resulting from flood or earthquake) in an amount not less than the greater of the full replacement value thereof or the Stipulated Loss Value thereof if applicable, and (2) commercial general liability insurance (including blanket contractual liability coverage and products liability coverage) for personal and bodily injury and property damage in an amount satisfactory to Lessor

(b) All insurance policies required hereunder shall (1) require thirty (30) days' prior written notice of cancellation or material change in coverage to Lessor (any such cancellation or change, as applicable, not being effective until the thirtieth (30th) day after the giving of such notice), (2) name "KeyCorp and its subsidiaries and affiliated companies, including Key Corporate Capital Inc , their successors and assigns" as an additional insured under the public liability policies and name Lessor as sole loss payee under the property insurance policies, (3) not require contributions from other policies held by Lessor, (4) waive any right of subrogation against Lessor, (5) in respect of any liability of Lessor, except for the insurers' salvage rights in the event of a loss, waive the right of such insurers to set-off, to counterclaim or to any other deduction, whether by attachment or otherwise, to the extent of any monies due Lessor under such policies, (6) not require that Lessor pay or be liable for any premiums with respect to such insurance covered thereby, (7) be in full force and effect throughout any geographical areas at any time traversed by any Item of Equipment, and (8) contain breach of warranty provisions providing that, in respect of the interests of Lessor in such policies, the insurance shall not be invalidated by any action or inaction of Lessee or any other person (other than Lessor) and shall insure Lessor regardless of any breach or violation of any warranty, declaration or condition contained in such policies by Lessee or by any other person (other than Lessor)  Prior to the first date of delivery of any Item of Equipment hereunder, and thereafter not less than 15 days prior to the expiration dates of the expiring policies theretofore delivered pursuant to this Section, Lessee shall deliver to Lessor a duplicate original of all policies (or in the case of blanket policies, certificates thereof issued by the insurers thereunder) for the insurance maintained pursuant to this Section

18.    **General Tax Indemnification.** Lessee shall pay when due and shall indemnify and hold Lessor harmless from and against (on an after-tax basis) any and all taxes, fees, withholdings, levies, imposts, duties, assessments and charges of any kind and nature arising out of or related to this Lease (together with interest and penalties thereon and including, without limitation, sales, use, gross receipts, personal property, real property, real estate excise, *ad valorem*, business and occupational, franchise, value added, leasing, leasing use, documentary, stamp or other taxes) imposed upon or against Lessor, any Lessor Assignee, Lessee or any Item of Equipment or the manufacturing, ordering, sale, purchase, shipment, delivery, acceptance or rejection, ownership, titling, registration, leasing, subleasing, possession, use, operation, removal, return or other disposition thereof or upon the rents, receipts or earnings arising therefrom or upon or with respect to this Lease, excepting only all Federal, state and local taxes on or measured by Lessor's net income (other than income tax resulting from making any alterations, improvements, modifications, additions, upgrades, attachments, replacements or substitutions by Lessee)  Whenever this Lease terminates as to any Item of Equipment, Lessee shall, upon written request by Lessor, advance to Lessor the amount estimated by Lessor to be the personal property or other taxes on said

item which are not yet payable, but for which Lessee is responsible Lessor shall, at Lessee's request, provide Lessee with Lessor's method of computation of any estimated taxes

**19.    Lessor's Right to Perform for Lessee.** If Lessee fails to perform any of its obligations contained herein, Lessor may (but shall not be obligated to) perform such obligations, and the amount of the reasonable costs and expenses of Lessor incurred in connection with such performance, together with interest on such amount at the Default Rate, shall be payable by Lessee to Lessor upon demand No such performance by Lessor shall be deemed a waiver of any rights or remedies of Lessor, or be deemed to cure the default of Lessee hereunder

**20.    Delinquent Payments.** If Lessee fails to pay any Rent or other sums under this Lease on or before the date when the same becomes due, Lessee shall pay to Lessor a late charge equal to the lesser of five percent (5%) of such delinquent amount or the maximum amount permitted under Applicable Law Such late charge shall be payable by Lessee upon demand by Lessor and shall be deemed Rent hereunder

**21.    Personal Property; Liens.** Lessor and Lessee hereby agree that the Equipment is, and shall at all times remain, personal property notwithstanding the fact that any Item of Equipment may now be, or hereafter become, in any manner affixed or attached to real property or any improvements thereon Lessee shall at all times keep the Equipment free and clear from all Liens Lessee shall (a) give Lessor immediate written notice of any such Lien, (b) promptly, at Lessee's sole cost and expense, take such action as may be necessary to discharge any such Lien, and (c) indemnify and hold Lessor, on an after-tax basis, harmless from and against any loss or damage caused by any such Lien

**22.    Events of Default; Remedies.** (a) As used herein, the term "Event of Default" shall mean any of the following events (1) Lessee fails to pay any Rent within ten (10) days after the same shall have become due, (2) Lessee or any Guarantor becomes insolvent or makes an assignment for the benefit of its creditors, (3) a receiver, trustee, conservator or liquidator of Lessee or any Guarantor or of all or a substantial part of Lessee's or such Guarantor's assets is appointed with or without the application or consent of Lessee or such Guarantor, respectively, (4) a petition is filed by or against Lessee or any Guarantor under any bankruptcy, insolvency or similar legislation, (5) Lessee or any Guarantor violates or fails to perform any provision of either this Lease or any other loan, lease or credit agreement or any acquisition or purchase agreement with Lessor or any other party, (6) Lessee violates or fails to perform any covenant or representation made by Lessee herein, (7) any representation or warranty made herein or in any certificate, financial statement or other statement furnished to Lessor (or Lessor's parent, subsidiaries or affiliates) shall prove to be false or misleading in any material respect as of the date on which the same was made, (8) Lessee makes a bulk transfer of furniture, furnishings, fixtures or other equipment or inventory, (9) there is a material adverse change in Lessee's or any Guarantor's financial condition since the first Rent Commencement Date of any Equipment Schedule executed in connection herewith, (10) Lessee merges or consolidates with any other corporation or entity, or sells, leases or disposes of all or substantially all of its assets without the prior written consent of Lessor, (11) a change in control occurs in Lessee or any Guarantor, or (12) the death or dissolution of Lessee or any Guarantor An Event of Default with respect to any Equipment Schedule hereunder shall, at Lessor's option, constitute an Event of Default for all Equipment Schedules hereunder and any other agreements between Lessor and Lessee

(b) Upon the occurrence of an Event of Default, Lessor may do one or more of the following as Lessor in its sole discretion shall elect (1) proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants of this Lease or to recover damages for the breach thereof, (2) sell any Item of Equipment at public or private sale, (3) hold, keep idle or lease to others any Item of Equipment as Lessor in its sole discretion may determine, (4) by notice in writing to Lessee, cancel or terminate this Lease, without prejudice to any other remedies hereunder, (5) demand that Lessee, and Lessee shall, upon written demand of Lessor and at Lessee's expense forthwith return all Items of Equipment to Lessor in the manner and condition required by Section 13 hereof, provided, however, that Lessee shall remain and be liable to Lessor for any amounts provided for herein or other damages resulting from the Equipment not being in the condition required by Section 12 hereof, and otherwise in accordance with all of the provisions of this Lease, except those provisions relating to periods of notice, (6) enter upon the premises of Lessee or other premises where any Item of Equipment may be located and, without notice to Lessee and with or without legal process, take possession of and remove all or any such Items of Equipment without liability to Lessor by reason of such entry or taking possession, and without such action constituting a cancellation or termination of this Lease unless Lessor notifies Lessee in writing to such effect, (7) by written notice to Lessee specifying a payment date (the "Remedy Date"), demand that Lessee pay to Lessor, and Lessee shall pay to Lessor, on the Remedy Date, as liquidated damages for loss of a bargain and not as a penalty, any unpaid Rent due prior to the Remedy Date

plus whichever of the following amounts Lessor, in its sole discretion, shall specify in such notice (together with interest on such amount at the Default Rate from the Remedy Date to the date of actual payment) (i) an amount, with respect to an Item of Equipment, equal to the Rent payable for such Item of Equipment for the remainder of the then current Term thereof, after discounting such Rent to present worth as of the Remedy Date on the basis of a per annum rate of discount equal to three percent (3%) from the respective dates upon which such Rent would have been paid had this Lease not been canceled or terminated, or (ii) the Stipulated Loss Value, computed as of the Remedy Date or, if the Remedy Date is not a Rent Payment Date, the Rent Payment Date next following the Remedy Date (provided, however, that, with respect to any proceeds actually received by Lessor for any Item of Equipment returned to or repossessed by Lessor, Lessor agrees that it shall first apply such proceeds to satisfy Lessee's obligation to pay the Stipulated Loss Value or, if Lessor has received payment in full of the Stipulated Loss Value from Lessee, Lessor shall remit such proceeds to Lessee (after first deducting any Lessor Expense) up to the amount of the Stipulated Loss Value, (8) cause Lessee, at its expense, to promptly assemble any and all Items of Equipment and return the same to Lessor at such place as Lessor may designate in writing, and (9) exercise any other right or remedy available to Lessor under Applicable Law or proceed by appropriate court action to enforce the terms hereof or to recover damages for the breach hereof or to rescind this Lease  In addition, Lessee shall be liable, except as otherwise provided above, for any and all unpaid Rent due hereunder before or during the exercise of any of the foregoing remedies, and for reasonable legal fees and other costs and expenses incurred by reason of the occurrence of any Event of Default or the exercise of Lessor's remedies with respect thereto  If an Event of Default occurs, Lessee hereby agrees that ten (10) days prior notice to Lessee of (A) any public sale or (B) the time after which a private sale may be negotiated shall be conclusively deemed reasonable and, to the extent permitted by Applicable Law, Lessee waives all rights and defenses with respect to such disposition of the Equipment  None of Lessor's rights or remedies hereunder are intended to be exclusive of, but each shall be cumulative and in addition to any other right or remedy referred to hereunder or otherwise available to Lessor at law or in equity, and no express or implied waiver by Lessor of any Event of Default shall constitute a waiver of any other Event of Default or a waiver of any of Lessor's rights

23.    **Notices.** All notices and other communications hereunder shall be in writing and shall be transmitted by hand, overnight courier or certified mail (return receipt requested), postage prepaid  Such notices and other communications shall be addressed to the respective party at the address set forth above or at such other address as any party may from time to time designate by notice duly given in accordance with this Section  Such notices and other communications shall be effective upon the earlier of receipt or three (3) days after mailing if mailed in accordance with the terms of this Section

24.    **General Indemnification.** (a) Lessee shall pay, and shall indemnify and hold Lessor harmless on an after-tax basis from and against, any and all liabilities, causes of action, claims, suits, penalties, damages, losses, costs or expenses (including attorneys' fees), obligations, liabilities, demands and judgments, and Liens, of any nature whatsoever (collectively, a "Liability") arising out of or in any way related to (1) the Lease Documents, (2) the manufacture, purchase, ownership, lease, acceptance, rejection, possession, lease, sublease, operation, use, maintenance, documenting, inspection, control, loss, damage, destruction, removal, storage, surrender, sale, use, condition, delivery, nondelivery, return or other disposition of or any other matter relating to any Item of Equipment or any part or portion thereof (including, in each case and without limitation, latent or other defects, whether or not discoverable, any claim for patent, trademark or copyright infringement) and any and all Liabilities in any way relating to or arising out of injury to persons, properties or the environment or any and all Liabilities based on strict liability in tort, negligence, breach of warranties or violations of any regulatory law or requirement, (3) a failure to comply fully with Applicable Law and (4) Lessee's failure to perform any covenant, or Lessee's breach of any representation or warranty, hereunder, provided, that the foregoing indemnity shall not extend to the Liabilities to the extent resulting solely from the gross negligence or willful misconduct of Lessor

(b)    Lessee shall promptly deliver to Lessor (1) copies of any documents received from the United States Environmental Protection Agency or any state, county or municipal environmental or health agency and (2) copies of any documents submitted by Lessee or any of its subsidiaries to the United States Environmental Protection Agency or to any state, county or municipal environmental or health agency concerning the Equipment or its operation

25.    **Severability; Captions.** Any provision of this Lease or any Equipment Schedule which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability shall not invalidate or render unenforceable such provision in any other jurisdiction  Captions are intended for

convenience or reference only, and shall not be construed to define, limit or describe the scope or intent of any provisions hereof

26.   **Lessor's Expense.** Lessee shall pay all costs and expenses of Lessor, including, without limitation, reasonable attorneys' and other professional fees, the fees of any collection agencies and appraisers and all other costs and expenses related to any sale or re-lease of the Equipment (including storage costs), incurred by Lessor in enforcing any of the terms, conditions or provisions hereof or in protecting Lessor's rights hereunder (each a "Lessor Expense")

27.   **Related Equipment Schedules**   In the event that any Item of Equipment covered under any Equipment Schedule hereunder may become attached or affixed to, or used in connection with, Equipment covered under another Equipment Schedule hereunder (a "Related Equipment Schedule"), Lessee agrees that, if Lessee elects to exercise a purchase or renewal option under any such Equipment Schedule, or if Lessee elects to return the Equipment under any such Equipment Schedule pursuant to Section 13 hereof, then Lessor, in its sole discretion, may require that all Equipment leased under all Related Equipment Schedules be similarly disposed of

28.   **Financial and Other Data**   During the Term hereof, Lessee shall furnish Lessor (a) as soon as available, and in any event within 120 days after the last day of each fiscal year, financial statements of Lessee and each Guarantor and (b) from time to time as Lessor may reasonably request, other financial reports, information or data (including federal and state income tax returns) and quarterly or interim financial statements of Lessee and each Guarantor All such information shall be audited (or if audited information is not available, compiled or reviewed) by an independent certified public accountant

29.   **[RESERVED]**

30.   **[RESERVED]**

31.   **Representations and Warranties of Lessee** Lessee represents and warrants that  (a) Lessee is a corporation duly organized and validly existing in good standing under the laws of the state of its incorporation, (b) the execution, delivery and performance of this Lease and all related instruments and documents  (1) have been duly authorized by all necessary corporate action on the part of Lessee, (2) do not require the approval of any stockholder, partner, trustee, or holder of any obligations of Lessee except such as have been duly obtained, and (3) do not and will not contravene any law, governmental rule, regulation or order now binding on Lessee, or the charter or by-laws of Lessee, or contravene the provisions of, or constitute a default under, or result in the creation of any lien or encumbrance upon the property of Lessee under, any indenture, mortgage, contract or other agreement to which Lessee is a party or by which it or its property is bound, (c) the Lease Documents, when entered into, will constitute legal, valid and binding obligations of Lessee enforceable against Lessee in accordance with the terms thereof, (d) there are no other threatened actions or proceedings to which Lessee is a party, and there are no actions or proceedings of which Lessee has knowledge, before any Governmental Authority, which, either individually or in the aggregate, would adversely affect the financial condition of Lessee, or the ability of Lessee to perform its obligations hereunder, (e) Lessee is not in default under any obligation for the payment of borrowed money, for the deferred purchase price of property or for the payment of any rent under any lease agreement which, either individually or in the aggregate, would have the same such effect, (f) under the laws of the state(s) in which the Equipment is to be located, the Equipment consists solely of personal property and not fixtures, (g) the financial statements of Lessee (copies of which have been furnished to Lessor) have been prepared in accordance with generally acceptable accounting principles consistently applied ("GAAP"), and fairly present Lessee's financial condition and the results of its operations as of the date of and for the period covered by such statements, and since the date of such statements there has been no material adverse change in such conditions or operations, (h) the address stated above is the chief place of business and chief executive office, or in the case of individuals, the primary residence, of Lessee, (i) Lessee does not conduct business under a trade, assumed or fictitious name, (j) the Equipment is being leased hereunder solely for business purposes and that no Item of Equipment will be used for personal, family or household purposes, and (k) except as previously disclosed in writing to Lessor, neither Lessee nor any of its officers or directors (if a corporation), partners (if a partnership) or members (if a limited liability company) has, directly or indirectly, any financial interest in the Supplier

32   **Renewal And Purchase Options.** With respect to an Equipment Schedule and the Equipment Group set forth thereon, Lessee shall have the purchase and renewal options set forth in such Equipment Schedule

33.    _Lessee's Waivers_  TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE (a) WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY SECTIONS 2A-508 THROUGH 2A-522 OF THE UNIFORM COMMERCIAL CODE AND (b)  ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE TO RECOVER INCIDENTAL OR CONSEQUENTIAL DAMAGES FROM LESSOR FOR ANY BREACH OF WARRANTY OR FOR ANY OTHER REASON OR TO SETOFF OR DEDUCT ALL OR ANY PART OF ANY CLAIMED DAMAGES RESULTING FROM LESSOR'S DEFAULT, IF ANY, UNDER THIS LEASE _PROVIDED, HOWEVER,_ THAT NO SUCH WAIVER SHALL PRECLUDE LESSEE FROM ASSERTING ANY SUCH CLAIM AGAINST LESSOR IN A SEPARATE CAUSE OF ACTION INCLUDING ANY CLAIM ARISING AS A RESULT OF LESSOR'S BREACH OF SECTION 38 HEREOF

34.    _UCC Filings_  LESSEE HEREBY APPOINTS LESSOR OR ITS ASSIGNEE AS ITS TRUE AND LAWFUL ATTORNEY IN FACT, IRREVOCABLY AND COUPLED WITH AN INTEREST, TO EXECUTE AND FILE ON BEHALF OF LESSEE ALL UCC FINANCING STATEMENTS WHICH IN LESSOR'S SOLE DISCRETION ARE DEEMED NECESSARY OR PROPER TO SECURE LESSOR'S INTEREST IN THE EQUIPMENT IN ALL APPLICABLE JURISDICTIONS.  Lessee hereby ratifies, to the extent permitted by law, all that Lessor shall lawfully and in good faith do or cause to be done by reason of and in compliance with this paragraph

35.    _Miscellaneous._  Time is of the essence with respect to this Lease  ANY FAILURE OF LESSOR TO REQUIRE STRICT PERFORMANCE BY LESSEE OR ANY WAIVER BY LESSOR OF ANY PROVISION HEREIN SHALL NOT BE CONSTRUED AS A CONSENT OR WAIVER OF ANY PROVISION OF THIS LEASE. This Lease and each Equipment Schedule shall be binding upon, and inure to the benefit of, the parties hereto, their permitted successors and assigns  This Lease will be binding upon Lessor only if executed by a duly authorized officer or representative of Lessor at Lessor's address set forth above  The Lease Documents shall be executed on Lessee's behalf by an Authorized Signer of Lessee  THIS LEASE IS BEING DELIVERED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

36.    _Jury Trial Waiver._  LESSOR AND LESSEE HEREBY EACH WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO  THE LEASE, THE LEASE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH LESSOR OR LESSEE MAY BE PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  LESSEE AND LESSOR AGREE THAT THEIR RESPECTIVE RIGHT TO JURY TRIAL IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THIS AGREEMENT OR THE OTHER LEASE DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY LESSOR AND LESSEE WHO EACH ACKNOWLEDGE THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THE LEASE AND THE LEASE DOCUMENTS.

37.    _More than One Lessee._  If more than one person or entity executes the Lease Documents as "Lessee," the obligations of "Lessee" contained herein and therein shall be deemed joint and several and all references to "Lessee" shall apply both individually and jointly

38.    _Quiet Enjoyment._  So long as no Default or Event of Default has occurred and is continuing, Lessee shall peaceably hold and quietly enjoy the Equipment without interruption by Lessor or any person or entity claiming through Lessor

---

39.    **Entire Agreement.** This Lease, together with all other Lease Documents constitute the entire understanding or agreement between Lessor and Lessee with respect to the leasing of the Equipment, and there is no understanding or agreement, oral or written, which is not set forth herein or therein  Neither this Lease nor any Equipment Schedule may be amended except by a writing signed by Lessor and Lessee

Lessee's Initials _____

40.    **Execution in Counterparts**  This Master Equipment Lease Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument

**IN WITNESS WHEREOF,** Lessor and Lessee have executed this Lease as of the day and year first above written

Lessor:

KEY EQUIPMENT FINANCE, A DIVISION OF KEY
CORPORATE CAPITAL INC
By _____
Name
Title

**Krista L. Spada**
Regional Business
Unit Manager

Lessee:

AERO PLASTICS, INC

x _____
Name
Title

"C"



C# 54474
L# 54475

# Amendment No. 01
## To Master Equipment Lease Agreement

**THIS AMENDMENT** dated as of November 6, 2002 amends that certain Master Equipment Lease Agreement dated as of November 6, 2002 between Key Equipment Finance, a Division of Key Corporate Capital Inc., as Lessor, and AERO PLASTICS, INC , as Lessee (the "Master Lease")   Unless otherwise specified herein, all capitalized terms shall have the meanings ascribed to them in the Master Lease

Lessor and Lessee hereby agree that the Master Lease will be amended, with respect to each Equipment Schedule executed in connection therewith, to add the following section

LESSEE'S FINANCIAL COVENANTS

Lessee covenants and agrees with Lessor that, while this Agreement is in effect, Lessee will maintain

(1)  **Minimum Adjusted Tangible Net Worth** as follows

| Requirement | Measure Date |
|---|---|
| $5,500,000 | 12/31/02 |
| $6,500,000 | 12/31/03 |

(2)  **Maximum Debt to Adjusted Tangible Net Worth** as follows

| Requirement | Measure Date |
|---|---|
| 7 25   1 00 | 12/31/02 |
| 5 75   1 00 | 12/31/03 |

(3)  Lessee's **Net Income** shall not be less than $1,500,000 for the fiscal year ending December 31, 2002, when measured as of the December 31, 2002 financial statement date, nor less than $1,500,000 for the fiscal year ending December 31, 2003, when measured as of the December 31, 2003 financial statement date, and it shall not be less than $1,500,000 for any fiscal year end thereafter, each of which shall be measured as of the December 31st financial statement date of any said year

(4)  **Minimum Fixed Charge Coverage** ratio to be no less than of 1 25  1 00, measured and reviewed quarterly on a calendar basis on a trailing twelve (12) month basis

All financial covenants are to be calculated on Lessee and Aero Realty Trust on a combined basis

**Defined Terms**. As used in this Agreement, the following terms shall have the following meanings

**Adjusted Tangible Net Worth** - the aggregate of the (a) par or stated value of all outstanding stock, (b) capital surplus, (c) retained earnings and (d) the amount of any subordinated debt to related or affiliated parties, *less* (w) any surplus resulting from any write-up of assets subsequent to the date of this Agreement, (x) the

**EXHIBIT**

C

book value of all intangible assets of Lessee, including, without limitation, any goodwill (including any amount, however designated, representing the excess of the purchase price paid for assets or stock acquired over the value assigned thereto on the books of Lessee), noncompetition agreements, consulting agreements, patents, trademarks, trade names and copyrights, (y) the amount paid for any treasury stock reflected as a reduction of the capital surplus or retained earnings accounts, and (z) the amount of any related or affiliated party accounts (including, but not limited to, accounts of subsidiaries, Affiliates or related companies), advances or notes receivable

__Debt__ - the sum of (i) indebtedness for borrowed money or for the deferred purchase price of property or services, (ii) capitalized lease obligations, (iii) all other items which in accordance with GAAP would be included in determining total liabilities as shown on a balance sheet as at the date as of which Debt is to be determined less any subordinated debt to related or affiliated parties

__Fixed Charge Coverage__ – shall mean, with respect to any particular fiscal period of Lessee, on a consolidated basis, the ratio of the sum (without duplication) of Lessee's (i) Net Income, plus (ii) depreciation, plus (iii) amortization, plus (iv) lease expense, plus (vi) interest expense for such fiscal period, to the sum (without duplication) of Lessee's (i) lease expense, __plus__ (ii) interest expense, __plus__ (iii) the sum of Lessee's current maturities of long-term debt, for such fiscal period, all as determined on a consolidated basis

__Net Income__ - shall mean, with respect to the Lessee, for any period, the income of Lessee for such period, after deducting there from all operating expenses, provisions for all taxes and reserves and all other proper deductions, all determined in accordance with GAAP

( C) __Compliance__ Lessee shall, within thirty (30) days of the end of each fiscal year end of Lessee, provide Lessor with a certificate (a "Compliance Certificate") representing that Lessee is in full compliance with the foregoing financial covenants and setting forth the calculations used by Lessee to reach its conclusion The Compliance Certificate shall be signed by Lessee's chief financial officer or, if Lessee does not have a chief financial officer, such other officer or employee of Lessee who performs the duties typically undertaken by a chief financial officer

Except as modified hereby, all of the terms, covenants and conditions of the Master Lease shall remain in full force and effect and are in all respects hereby ratified and affirmed

IN WITNESS WHEREOF, Lessor and Lessee have executed this Amendment as of the date first above written

Lessor:

Key Equipment Finance,
a Division of Key Corporate Capital Inc

By _____
Name
Title                    Krista L. Spada
                    Regional Business
                    Unit Manager

Lessee:

AERO PLASTICS, INC

X _____
Name
Title

"D"

JAN-25-2005  12:37       CENTER CAPITAL                860 677 1888    P.12



C#: 54474
T.#: 54475

# Amendment No. 02
## To Master Equipment Lease Agreement

**THIS AMENDMENT** dated as of December 10, 2002 amends that certain Master Equipment Lease Agreement dated as of November 6, 2002 between **Key Equipment Finance, a Division of Key Corporate Capital Inc.**, as Lessor, and **AERO PLASTICS, INC.**, as Lessee (the "Master Lease"). Unless otherwise specified herein, all capitalized terms shall have the meanings ascribed to them in the Master Lease.

Lessor and Lessee hereby agree that the Master Lease will be amended, with respect to each Equipment Schedule executed in connection therewith, to add the following section:

**LESSEE'S FINANCIAL COVENANTS.**

Lessee covenants and agrees with Lessor that, while this Agreement is in effect, Lessee will maintain:

    (1)    Lessee's <u>Minimum Adjusted Tangible Net Worth</u> shall not be less than $5,500,000 for the fiscal year ending December 31, 2002, nor less than $6,500,000 for the fiscal year ending December 31, 2003 and any fiscal year end thereafter.

    (2)    Lessee's <u>Maximum Debt to Adjusted Tangible Net Worth</u> shall not be greater than 7.25:1.00 for the fiscal year ending December 31, 2002 nor greater than 5.75:1.00 for the fiscal year ending December 31, 2003 and any fiscal year end thereafter.

    (3)    Lessee's <u>Net Income</u> shall not be less than $1,500,000 for the fiscal year ending December 31, 2002, when measured as of the December 31, 2002 financial statement date, nor less than $1,500,000 for the fiscal year ending December 31, 2003, when measured as of the December 31, 2003 financial statement date, and it shall not be less than $1,500,000 for any fiscal year end thereafter, each of which shall be measured as of the December 31st financial statement date of any said year.

    (4)    <u>Minimum Fixed Charge Coverage</u> ratio to be no less than 1.25: 1.00, measured and reviewed quarterly on a calendar basis on a trailing twelve (12) month basis.

        All financial covenants are to be calculated on Lessee and Aero Realty Trust on a combined basis.

<u>**Defined Terms.**</u> As used in this Agreement, the following terms shall have the following meanings:

    <u>Adjusted Tangible Net Worth</u> – the aggregate of the (a) par or stated value of all outstanding stock; (b) capital surplus; (c) retained earnings and (d) the amount of any subordinated debt to related or affiliated parties, less (w) any surplus resulting from any write-up of assets subsequent to the date of this Agreement; (x) the book value of all intangible assets of Lessee, including, without limitation, any goodwill (including any amount, however designated, representing the excess of the purchase price paid for assets or stock acquired over the value assigned thereto on the books of Lessee), noncompetition agreements, consulting agreements, patents, trademarks, trade names and copyrights; (y) the amount paid for any treasury stock reflected as a reduction of the capital surplus or retained earnings accounts; and (z) the amount of any related or affiliated party accounts

EXHIBIT

D

Dec 24 02 10:53a                                                      860 677 1888    P.13

(including, but not limited to, accounts of subsidiaries, Affiliates or related companies), advances or notes receivable.

Debt – the sum of (i) indebtedness for borrowed money or for the deferred purchase price of property or services, (ii) capitalized lease obligations, (iii) all other items which in accordance with GAAP would be included in determining total liabilities as shown on a balance sheet as at the date as of which Debt is to be determined less any subordinated debt to related or affiliated parties.

Fixed Charge Coverage – shall mean, with respect to any particular fiscal period of Lessee, on a consolidated basis, the ratio of the sum (without duplication) of Lessee's (i) Net Income, plus (ii) depreciation, plus (iii) amortization, plus (iv) lease expense, plus (vi) interest expense for such fiscal period, to the sum (without duplication) of Lessee's (i) lease expense, plus (ii) interest expense, plus (iii) the sum of Lessee's current maturities of long-term debt, for such fiscal period, all as determined on a consolidated basis.

Net Income - shall mean, with respect to the Lessee, for any period, the income of Lessee for such period, after deducting there from all operating expenses, provisions for all taxes and reserves and all other proper deductions, all determined in accordance with GAAP.

( C) Compliance Lessee shall, within thirty (30) days of the end of each fiscal year end of Lessee, provide Lessor with a certificate (a "Compliance Certificate") representing that Lessee is in full compliance with the foregoing financial covenants and setting forth the calculations used by Lessee to reach its conclusion. The Compliance Certificate shall be signed by Lessee's chief financial officer or, if Lessee does not have a chief financial officer, such other officer or employee of Lessee who performs the duties typically undertaken by a chief financial officer.

Except as modified hereby, all of the terms, covenants and conditions of the Master Lease shall remain in full force and effect and are in all respects hereby ratified and affirmed.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Amendment as of the date first above written.

Lessor:                                      Lessee:

Key Equipment Finance,                       AERO PLASTICS, INC.
a Division of Key Corporate Capital Inc.

By:                                          X
Name:                                        Name:   Jeff Goldberg
Title:   Sandra L. Costanzo                  Title:  President
         Regional Business
         Unit Manager

Form No: 96-002.801



JAN-25-2005  12:55    CENTER CAPITAL                                860 677 1888    P.08

## LEASE ORIGINATION AGREEMENT

This **LEASE ORIGINATION AGREEMENT** (this "Agreement") is made as of the 19th day of December, 2002, by and between **CENTER CAPITAL CORPORATION**, with its principal place of business at 4 Farm Springs Road, Farmington, CT 06032 ("Buyer") and **KEY EQUIPMENT FINANCE, A DIVISION OF KEY CORPORATE CAPITAL INC.**, a Michigan corporation, with a place of business at 66 South Pearl Street, Albany, New York 12207 ("KEF").

### RECITALS

A.  KEF and **AERO PLASTICS, INC.** ("Lessee") have entered into that certain Master Equipment Lease Agreement (the "Master Lease") dated as of November 6, 2002.

B.  Lessee's obligations under the Master Lease are guaranteed by and that certain Corporate Guaranty, **AERO REALTY TRUST** and that certain Personal Guaranty, **JEFFREY S. GOLDBERG** (collectively, the "Guarantor"), dated as of December 18, 2002 and November 8, 2002, respectively, (collectively, the "Guaranty")

C.  The Master Lease contemplates that Lessee may from time to time enter into equipment schedules that incorporate therein the terms of the Master Lease, and pursuant to which Lessee will lease certain equipment, and under terms, more particularly described in such equipment schedules.

D.  Buyer wishes to enter into Equipment Schedule No. 02 dated December 2, 2002 to the Master Lease (the "Schedule") directly with Lessee under the terms of the Master Lease.

E.  KEF is willing to agree that Buyer may enter into the Schedule under the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  <u>Consideration</u>.  In consideration of the rights granted by KEF to Buyer hereunder, Buyer agrees to pay to KEF an amount (in cash or other readily available funds) equal to Eight Hundred Forty Thousand Seven Hundred Sixty Dollars ($840,760.00) (the "Consideration").  Buyer shall not obtain any right, title or interest under the Schedule unless and until KEF shall have received the Consideration.

2.  <u>Master Lease Parties</u>.  Notwithstanding that the Master Lease has been executed by KEF, as lessor, Buyer shall be deemed to be the lessor under the Master Lease to the extent, and only to the extent, the Master Lease is incorporated into the Schedule.  In furtherance of the foregoing, KEF shall execute and deliver to the Lessee and Guarantor a Notice and Acknowledgement of Assignment in substantially the form attached hereto as Exhibit 1.

3.  <u>Allocation of Rights and Obligations</u>.  Buyer shall be entitled to all of the rights, and shall be bound by all of the obligations, of the lessor under the Master Lease to the extent, and only to the extent, the Master Lease is incorporated into the Schedule.  Without limiting the generality of the foregoing, Buyer is obligated to, and shall, purchase and deliver the Equipment to the Lessee as specified in the Master Lease and the Schedule.

4.  <u>Separate Leases</u>.  Each equipment schedule (including the Schedule) executed and delivered under the Master Lease is a separate lease from each other equipment schedule executed and delivered in connection with the Master Lease.  Each of Buyer and KEF may take enforcement action independently of the owners or pledgees of equipment schedules not owned by Buyer or KEF, respectively, and independently of the owners of equipment not covered by each of their respective equipment schedules.

5.  <u>KEF Representations and Warranties; Disclaimer</u>.  KEF hereby represents and warrants to Buyer as follows:

**EXHIBIT**

E

"E"

JHN-25-2005  12:36        CENTER CAPITAL                                              860 677 1888     P.09

as applicable) or event whi   with the giving of notice or lapse of tim    both, would become a default, has occurred under the Master Lease, and all amounts, dates, and signatures contained in the Lease and the Guaranty are true and correct.

(b) Lessee has executed only one (1) original of the Schedule which has been delivered to Buyer and which complies with all terms and conditions of the Master Lease.

(c) So far as enforcement of the Schedule is concerned, notwithstanding the existence of other schedules or supplements to the Master Lease, each schedule is separate and severable and Buyer may take enforcement action with respect to the Schedule independently of any other party.

(d) KEF has no reason to believe that either the Master Lease or the Guaranty

  (i) has not been duly and validly authorized, executed and delivered by the Lessee or any Guarantor, as appropriate;

  (ii) is not in full force and effect with respect to the Lessee or any Guarantor, as appropriate; or

  (iii) does not constitute legal, valid and binding obligations of the party executing same, enforceable against said party in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, and by applicable laws and judicial decisions which may affect the remedies provided therein.

(e) to KEF's knowledge, neither the Lessee nor any Guarantor has

  (i) made any assignment for the benefit of creditors,

  (ii) ceased to do business as a going concern,

  (iii) filed a petition under the United States Bankruptcy Code or for appointment of a receiver, or

  (iv) in the case of an individual, died.

(f) Except as set forth in this section, KEF has not heretofore made, nor does it hereby make any representations or warranties, and KEF assumes no liabilities or responsibilities with respect to the due execution by the Lessee or the Guarantor or the legality, validity, sufficiency, enforceability of or collectability under the Schedule or any document related thereto

6. **Buyer's Representations and Warranties**. Buyer hereby represents and warrants to KEF as follows:

(a) It has independently and without reliance upon KEF conducted its own credit and documentation evaluation, reviewed such information as it has deemed adequate and appropriate and made its own analysis of the Lessee, the Equipment, the Master Lease and the Schedule, including without limitation the adequacy or appropriateness of the provisions contained in the Master Lease and the Schedule.

(b) It has not relied upon any investigation or analysis conducted by, advice or communication from, or any warranty or representation by, KEF or any agent or employee of KEF, express or implied, concerning

  (i) the financial condition of the Lessee or the Guarantor,

  (ii) except as expressly provided in section 5 above, the documentation for the transaction,

  (iii) the Equipment, or

  (iv) the tax or economic benefits of an investment in the Schedule.

(c) It has had access to all financial and other information it deems necessary to evaluate the merits and risks of an investment in the Schedule including the opportunity to ask questions, receive answers and obtain additional information from KEF and the Lessee necessary to verify the accuracy of information provided.

(d) It acknowledges that KEF takes no responsibility for and makes no representation or warranty regarding any financial information regarding the Lessee or any Guarantor furnished to Assignee by KEF.

(e) It or its authorized representatives acting on its behalf have such knowledge and experience in business and financial matters necessary to evaluate the merits and risks of investing in the Schedule.

(f) It is experienced in making investments in lease transactions similar to the Schedule and it is financially able to undertake the risks involved in this transaction.

7. **Ongoing Mutual Covenants**. Each of Buyer and KEF agrees:

(a) promptly to remit to the other such payments as are incorrectly received by such party with respect to the other party's equipment schedules or equipment;

(b) without the prior written consent of the other party, not to take any action that may reasonably be anticipated to impair the rights of the other party with respect to those equipment schedules in which such covenanting party has no right, title or interest; provided, that the foregoing covenant shall not require either party to obtain the consent of the other prior to exercising any of its rights and remedies under any equipment schedule if such exercise relates solely to the equipment schedule then owned by such party; and

(c) to notify the other promptly upon obtaining actual knowledge of any default in the performance of the obligations of the Lessee under the Master Lease or the Guarantor under the Guaranty.

Form No : 02-702.602

8. **Miscellaneous.**

(a) Notices. All notices and other communications hereunder shall be in writing, personally delivered or sent by certified mail, return receipt requested, addressed to the other party at its respective address stated below the signature of such party or at such other address as such party shall from time to time designate in writing to the other party, and shall be effective from the date of receipt.

(b) Brokers. Neither party has, directly or indirectly, employed any broker, finder, financial advisor or intermediary (each a "Broker") in connection with the transactions contemplated by this Agreement who might be entitled to a brokerage, finders', or other fee or commission upon the execution of this Agreement or the consummation of the transactions contemplated hereby. If either party shall have engaged a Broker contrary to the foregoing representation, the party who entered into such agreement or arrangement shall be solely responsible for any fees or expenses due in connection therewith.

(c) Governing Law. This Agreement and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed in accordance with, the internal laws of the State of New York (without regard to the conflict of laws principles of such State), including all matters of construction, validity and performance.

(d) Limitation of Damages. Notwithstanding anything to the contrary contained herein, neither party hereto shall be liable for any special, incidental or consequential damages, all rights to which are hereby expressly waived by each of the parties hereto.

(e) Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and shall not be amended or altered in any manner except by a document in writing executed by both parties.

(f) Further Assurances. Each party agrees to take or cause to be taken such actions, and to do or cause to be done all such things, as the other party may reasonably request in order to further the transactions contemplated hereunder.

(g) Waiver of Jury Trial. KEF AND BUYER EACH HEREBY UNCONDITIONALLY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR ANY DEALINGS BETWEEN ASSIGNOR AND ASSIGNEE RELATING TO THE SUBJECT MATTER HEREOF.

IN WITNESS WHEREOF, KEF and Buyer have caused this Agreement to be executed by their respective duly authorized representatives as of the date first above written.

KEY EQUIPMENT FINANCE, A DIVISION OF
KEY CORPORATE CAPITAL, INC.

By: _____

Name: _____Sandra L. Costanzo_____
              Regional Business
Title: _____Unit Manager_____

Address:
66 South Pearl Street 7th Floor
Albany, New York 12207
ATTN: Syndication Account Manager
Facsimile: (518) 257-8824

CENTER CAPITAL CORPORATION
Buyer

By: _____

Name: _____M LENGSOU_____

Title: _____VP._____

Address:
4 Farm Springs Road
Farmington, CT 06032

Facsimile: (860) 677-2576

Attachment:

    Exhibit 1        Form of Notice and Acknowledgement of Assignment

"F"

C#: 54474
L#: 54475
Ls#: 8800022311

# Equipment Schedule No. 2

EQUIPMENT SCHEDULE NO. 2 dated as of December 2, 2002 (this "Schedule") to the Master Equipment Lease Agreement dated as of November 6, 2002 (the "Master Lease"), both between Center Capital Corporation, ("Lessor"), and AERO PLASTICS, INC., a Massachusetts corporation ("Lessee"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings specified in the Master Lease.

## EQUIPMENT & INVOICING TERMS

1.    **EQUIPMENT.** Pursuant to the terms and conditions of this Lease, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the equipment listed on Exhibit A attached hereto (the "Equipment"). The aggregate Total Cost of such Equipment is $829,560.00.

2.    **TERM.** The Initial Term of this Lease with respect to the Equipment described on this Schedule shall commence on the date on which such Equipment is delivered to Lessee, and, unless earlier terminated as provided herein, shall expire on a date, which is seventy-two (72) months after the Rent Commencement Date (the "Initial Term Expiration Date").

3.    **RENT PAYMENT DATES; RENT.** Lessee hereby agrees to pay Rent for the Equipment throughout the Initial Term in seventy-two (72) consecutive monthly installments payable in arrears on the date, which is one (1) month after the Rent Commencement Date, and on the same day of each month thereafter (each, a "Rent Payment Date"). Each such installment of Rent shall be in an amount equal to $11,682.09. In addition, Lessee hereby agrees to pay Rent for the period commencing on the Interim Rent Commencement Date (as defined below) and ending on the day before the Rent Commencement Date in an amount equal to $389.40 per day, and agrees that, with respect to the Equipment described on this Schedule, the following modifications are hereby made to the Master Lease: (a) "Rent Commencement Date" shall mean, with respect to an Equipment Group, the first (1st) day of the first month following the date of the Certificate of Acceptance for such Equipment Group, (b) "Interim Rent Commencement Date" shall mean, with respect to an Equipment Group, the date of the Certificate of Acceptance for such Equipment Group, or such later date (prior to the Rent Commencement Date) as determined by Lessor in its sole discretion, (c) Section 6 of the Master Lease ("Ordering Equipment") is hereby amended to delete the term "Rent Commencement Date" and to substitute the term "Interim Rent Commencement Date" in its place and (d) Section 22(a)(9) of the Master Lease ("Events of Default; Remedies") is hereby amended to delete the term "Rent Commencement Date" and to substitute the phrase "Rent Commencement Date or Interim Rent Commencement Date, as the case may be," in its place.

4.    **EQUIPMENT LOCATION; BILLING ADDRESS.** The Equipment described on this Schedule shall be located at, and, except as otherwise provided in this Lease, shall not be removed from, the following address: Greenwood Industrial Park #9 McDonough, GA 30253. The billing address of Lessee is as follows: AERO PLASTICS, INC., 163 Pioneer Drive, Leominster, MA 01453.

## TRANSACTION TYPE TERMS

5.    **PURCHASE, RENEWAL AND OPTION TERMS.** (a) First Amendment.  With respect to the Equipment described on this Schedule, Section 32 of the Master Lease ("Renewal and Purchase Options") is hereby deleted in its entirety and the following is substituted in its place:

**EXHIBIT**

**F**

(i)  So long as no Default or Event of Default shall have occurred and be continuing and Lessee shall have given Lessor at least ninety (90) days but not more than one hundred eighty (180) days prior written notice to Lessor, Lessee shall have the option (the "Purchase Option") to purchase all, but not less than all, Items of Equipment on the Initial Term Expiration Date at a price (the "Purchase Option Price") equal to the greater of (A) the then Fair Market Sale Value thereof, or (B) Twenty percent (20%) of the Total Cost of the Equipment, in each case plus any applicable sales taxes. Payment of the Purchase Option Price, applicable sales taxes, together with all other amounts due and owing by Lessee under the Lease (including, without limitation, Rent) on or before the Initial Term Expiration Date, shall be made on the Initial Term Expiration Date in immediately available funds against delivery of a bill of sale transferring to Lessee all right, title and interest of Lessor in and to the Equipment ON AN "AS IS" "WHERE IS" BASIS, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. LESSOR MAY SPECIFICALLY DISCLAIM ANY SUCH REPRESENTATIONS AND WARRANTIES. Lessor and Lessee shall mutually agree upon the Fair Market Sale Value with respect to the Purchase Option; provided, however, that, if Lessor and Lessee are unable to agree upon the Fair Market Sale Value within fifteen (15) day's after Lessor's receipt of the Option Notice, the Fair Market Sale Value shall be determined in accordance with the Appraisal Procedure.

(ii)  If the Purchase Option is not exercised or consummated for any reason, then (A) the Term of the Lease shall be automatically extended for an additional, non-cancelable period of twelve (12) months (the "Extended Lease Term"), and (B) Lessee hereby agrees to pay Rent for the Equipment throughout the Extended Lease Term in twelve (12) consecutive monthly installments payable in arrears commencing on the date which is one (1) month after the Initial Term Expiration Date and on the same day each month thereafter. Each such installment of Rent during the Extended Lease Term shall be in an amount equal to $14,426.28.

(iii)  So long as no Default or Event of Default shall have occurred and is continuing upon not less than ninety (90) days but not more than one hundred eighty (180) days prior written notice (the "Option Notice") to Lessor, Lessee shall have the option at the expiration of the Extended Lease Term (the "Extended Term Expiration Date") to (A) purchase all, but not less than all, Items of Equipment for a purchase price (the "Purchase Option Price") equal to the then Fair Market Sale Value thereof; (B) renew this Lease on a month to month basis at the same Rent payable at the expiration of such Extended Lease Term, as the case may be; (C) renew this Lease for a minimum period of not less than twelve (12) consecutive months at the then current Fair Market Rental Value; or (D) return such Equipment to Lessor pursuant to, and in the condition required by, the Lease. If Lessee fails to give Lessor the Option Notice at least ninety (90) days before the Extended Term Expiration Date, Lessee shall be deemed to have chosen option (B) above. Payment of the Fair Market Sale Value, applicable sales taxes, together with all other amounts due and owing by Lessee under the Lease (including, without limitation, Rent) on or before the Extended Term Expiration Date, shall be made on the Extended Term Expiration Date in immediately available funds against delivery of a bill of sale transferring to Lessee all right, title and interest of Lessor in and to the Equipment ON AN "AS IS" "WHERE IS" BASIS WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. LESSOR MAY SPECIFICALLY DISCLAIM ANY SUCH REPRESENTATIONS AND WARRANTIES.

(b) Early Buyout Option. So long as no Default or Event of Default shall have occurred and be continuing, Lessee shall have the option to purchase all, but not less than all, Items of Equipment on the date which is sixty (60) months after the Rent Commencement Date (the "EBO Date") at a price (the "EBO Price") equal to thirty-six and forty-one hundredths percent (36.41%) of the Total Cost of the Equipment, plus any applicable sales taxes. For Lessee to exercise its option hereunder, Lessee shall notify Lessor in writing of its desire to effect such option at least ninety (90) days (but not more than one hundred eighty (180) days) prior to the EBO Date. Such notice shall be irrevocable. The EBO Price represents the parties present best estimate of the fair market value of the Equipment on the EBO Date determined by using commercially reasonable methods, which are standard in the industry. Payment of the EBO Price, applicable sales taxes, together with all other amounts due and owing by Lessee under the Lease (including,

without limitation, Rent) on or before the EBO Date, shall be made on the EBO Date in immediately available funds. Thereafter, upon Lessee's written request, Lessor shall deliver to Lessee a bill of sale transferring to Lessee all right, title and interest of Lessor in and to the Equipment ON AN "AS IS" "WHERE IS" BASIS, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER. If Lessee shall fail to pay all amounts required to be paid under the Lease on the EBO Date, the Lease shall continue in full force and effect and Lessee agrees to reimburse Lessor for all reasonable costs, expenses and liabilities incurred in connection therewith.

6.     NATURE OF TRANSACTION; TRUE LEASE. (a) It is the express intent of the parties that this Lease constitutes a true lease and not a sale of the Equipment. Title to the Equipment shall at all times remain in Lessor, and Lessee shall acquire no ownership, title, property, right, equity, or interest in the Equipment other than its leasehold interest solely as Lessee subject to all the terms and conditions hereof. To the extent that Article 2A ("Article 2A") of the Uniform Commercial Code ("UCC") applies to the characterization of this Lease, the parties hereby agree that this Lease is a "Finance Lease" as defined therein. Lessee acknowledges: (i) that Lessee has selected the "Supplier" (as defined in the UCC) and has directed Lessor to purchase the Equipment from the Supplier in connection with this Lease, and (ii) that Lessee has been informed in writing in this Lease, before Lessee's execution of this Lease, that Lessee is entitled under Article 2A to the promises and warranties, including those of any third party, provided to Lessor by the Supplier in connection with or as part of the Purchase Agreement, and that Lessee may communicate with the Supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies. The filing of UCC financing statements pursuant to Section 34 of the Master Lease is precautionary and shall not be deemed to have any effect on the characterization of this Lease. NOTWITHSTANDING THE FOREGOING, LESSOR HAS NOT MADE, AND HEREBY DISCLAIMS ANY ADVICE, REPRESENTATIONS, WARRANTIES AND COVENANTS, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO ANY LEGAL, ECONOMIC, ACCOUNTING, TAX OR OTHER EFFECTS OF THE LEASE AND THE TRANSACTION(S) CONTEMPLATED THEREBY, AND LESSEE HEREBY DISCLAIMS ANY RELIANCE ON ANY SUCH WARRANTIES, STATEMENTS OR REPRESENTATIONS MADE BY LESSOR WITH RESPECT THERETO.

(b) Notwithstanding the express intent of Lessor and Lessee that this agreement constitute a true lease and not a sale of the Equipment, should a court of competent jurisdiction determine that this agreement is not a true lease, but rather one intended as security, then solely in that event and for the expressly limited purposes thereof, Lessee shall be deemed to have hereby granted Lessor a security interest in the Equipment and all accessions, substitutions and replacements thereto and therefor, and proceeds (cash and non-cash), including, without limitation, insurance proceeds thereof (but without power of sale), to secure the prompt payment and performance as and when due of all obligations and indebtedness of Lessee, now existing or hereafter created, to Lessee pursuant to this Lease or otherwise. In furtherance of the foregoing, Lessee shall execute and deliver to Lessor, to be filed at Lessee's expense, Uniform Commercial Code financing statements, statements of amendment and statements of continuation as reasonably may be required by Lessor to perfect and maintain perfected such security interest.

(c) In the event that the Supplier erroneously invoices Lessee for the Equipment, Lessee agrees to forward said invoice to Lessor immediately. Lessee acknowledges that the Equipment is, and shall at all times remain, the property of Lessor, and that Lessee has no right, title or interest therein or thereto except as expressly set forth in this Lease.

7.     TAX INDEMNIFICATION. (a) Lessee acknowledges that Lessor has executed this Lease, and that the Rent payable by Lessee under this Lease has been computed, upon the assumptions that Lessor will (i) be entitled to depreciation or cost recovery deductions ("MACRS Deductions") for Federal income tax purposes under the Modified Accelerated Cost Recovery System provided for in Section 168 of the Internal Revenue Code of 1986, as amended (the "Code"), and depreciation or cost recovery deductions ("State Depreciation Deductions") for state income tax purposes for the Equipment Location, in each case on the basis that (1) each Item of Equipment constitutes " 7-year property" within the meaning of Section 168(e) of the Code, (2) the initial tax basis for each Item of Equipment will be equal to the Total Cost, (3) deductions for each Item of Equipment will be computed by using the methods specified in Section 168 of the Code over the 7-year recovery period described in Section 168(c) of the

Code, and (4) the applicable convention for each Item of Equipment under Section 168(d) of the Code is the half-year convention; (ii) be entitled to deductions for Federal income tax purposes (available in the manner and as provided by Section 163 of the Code) for interest payable with respect to any indebtedness incurred by Lessor in connection with any financing by Lessor of any portion of the Total Cost of each Item of Equipment ("Interest Deductions"); and (iii) be subject to tax for each year at a composite Federal and New York corporate income tax rate equal to the then highest marginal rate for corporations provided for under the Code and the laws of New York (the "Highest Marginal Tax Rate"). The MACRS Deductions, State Depreciation Deductions and Interest Deductions are hereinafter collectively referred to as the "Tax Benefits".

(b) Lessee represents and warrants to Lessor that: (i) each Item of Equipment constitutes "7-year property" within the meaning of Section 168(e) of the Code, (ii) Lessee shall not attempt to claim the Tax Benefits, (iii) at and after the time of delivery of the Equipment to Lessee pursuant to this Lease the Lessee shall not claim any ownership or title in and to the Equipment, and (iv) Lessee has not, and will not, at any time take any action or omit to take any action (whether or not the same is permitted or required hereunder) which will prevent Lessor from claiming, or result in the loss by Lessor of, all or any part of such Tax Benefits.

(c) If, as a result of any act, omission or misrepresentation of Lessee, (x) the Tax Benefits are lost, disallowed, deferred, eliminated, reduced, recaptured, compromised or otherwise unavailable to Lessor, (y) for Federal, foreign, state or local income tax purposes, any item of income, loss or deduction with respect to any Item of Equipment is treated as derived from, or allocable to, sources outside the United States, or (z) there shall be included in the gross income of Lessor for Federal, state or local income tax purposes any amount on account of any addition, modification, substitution or improvement to or in respect of any Item of Equipment made or paid for by Lessee (any of the foregoing being hereinafter a "Tax Loss"), then, within thirty (30) days of Lessee's receipt of written notice from Lessor that such a Tax Loss has occurred, Lessee shall pay to Lessor an amount which, after deduction therefrom of all taxes to be paid in respect of the receipt thereof, will enable Lessor to receive the same Net Economic Return (as hereinafter defined) that Lessor would have realized on this Lease had such Tax Loss (together with any interest, penalties or additions to tax) not occurred. Any event which, by the terms of this Lease, requires payment by Lessee to Lessor of the Stipulated Loss Value of the Equipment shall not constitute the act of Lessee for purpose of the foregoing sentence.

(d) As used in this Section, the term "Net Economic Return" shall mean Lessor's net after-tax yield, aggregate after-tax cash flow and return on assets, based on (i) the assumptions used by Lessor in originally calculating Rent and Stipulated Loss Value percentages, including the assumptions set forth above (as such assumptions may have been revised pursuant to the last sentence of this subsection) and (ii) the Highest Marginal Tax Rate actually in effect during each year from the date of such original calculations to the date of such Tax Loss, both dates inclusive. In the event Lessor shall suffer a Tax Loss with respect to which Lessee is required to pay an indemnity hereunder, and the full amount of such indemnity has been paid or provided for hereunder, the aforesaid assumptions, without further act of the parties hereto, shall thereupon be and be deemed to be amended, if and to the extent appropriate, to reflect such Tax Loss.

(e) For purposes of this Section, the term "Lessor" shall include the entity or entities, if any, with which Lessor consolidates any tax return. Lessee acknowledges that it has neither sought nor received tax advice from Lessor as to the availability to Lessee of any tax benefits with respect to the Equipment. All of Lessor's rights and privileges arising from the indemnities contained in this Lease will survive the expiration or other termination or cancellation of this Lease. Such indemnities are expressly made for the benefit of, and are enforceable by, Lessor and its successors and assigns.

8.    STIPULATED LOSS VALUE; DISCOUNT RATE. (a) The Stipulated Loss Values applicable to the Equipment and this Lease are as set forth on a supplement (the "Stipulated Loss Value Supplement") prepared by Lessor.

(b) Any provision of this Lease to the contrary notwithstanding, all present value calculations to be made with respect to the Equipment described on this Schedule shall be made using a discount rate equal to three percent (3%).

9.    **PERSONAL PROPERTY TAX.** Unless otherwise directed in writing by Lessor or required by Applicable Law, Lessee will not list itself as owner of any Item of Equipment for property tax purposes. Upon receipt by Lessee of any property tax bill pertaining to such Item of Equipment from the appropriate taxing authority, Lessee will promptly forward such property tax bill to Lessor. Upon receipt by Lessor of any such property tax bill (whether from Lessee or directly from the taxing authority), Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

10.    **MODIFICATIONS TO MASTER LEASE.** With respect to the Equipment described on this Schedule, the Master Lease shall be modified as follows:

(a)    [RESERVED]:

(b)    Section 22(b)(7) of the Master Lease ("Events of Default; Remedies"), is hereby amended by adding the following after the first parenthetical "demand that Lessee forthwith return all Items of Equipment to Lessor in the manner and condition required by Section 22(b)(5) hereof and in addition".

## MISCELLANEOUS TERMS & CONDITIONS

11.    **ADDITIONAL MAINTENANCE REQUIREMENTS.** Section 13 of the Master Lease ("Return of Equipment") shall be deleted in its entirety and the following substituted in its place:

**Return of Equipment.** (a) Upon the expiration of the Term of any Lease or upon demand by Lessor pursuant to Section 22 hereof, Lessee, at its sole expense, shall return all of the Equipment leased under the Lease by delivering it in a manner consistent with the manufacturer's recommendations and practices to such place or on board such carrier (packed properly and in accordance with the manufacturer's instructions) as Lessor shall specify. Lessee agrees that the Equipment, when returned, shall be free and clear of all Liens, and in the same condition as when delivered to Lessee, reasonable wear and tear excepted. Reasonable wear and tear shall mean that each Item of the Equipment has been maintained by Lessee in "Average Saleable Condition" (as hereinafter defined) and that all components of the Equipment have been properly serviced, following the manufacturer's written operating and servicing procedures, such that the Equipment is eligible for a manufacturer's standard, full service maintenance contract without Lessor's incurring any expense to repair or rehabilitate the Equipment. If, in the opinion of Lessor, any item of the Equipment fails to meet the standards set forth in this Section 13, Lessee agrees to pay on demand all costs and expenses incurred in connection with repairing the Equipment, restoring it to such condition so as to meet such standards and assembling and delivering such Item of Equipment pursuant to Lessor's instructions. If Lessee fails to return any Item of Equipment as required hereunder, then, all of Lessee's obligations under this Lease (including, without limitation, Lessee's obligation to pay Rent for such Item of Equipment at the rental then applicable under this Lease) shall continue in full force and effect until such Item of Equipment shall have been returned in the condition required hereunder.

(b) Lessee shall give Lessor at least ninety (90), but not more than one hundred eighty (180) days written notice that Lessee is returning the Equipment as provided for above (the "Return Notice") and shall include with such notice, all of the following:

(i)    a detailed inventory of all components of the Equipment including without limitation all of the model and serial numbers of any components;

(ii)      a complete set of current and up to date service and operating manuals for each Item of Equipment;

(iii)     a complete set of current and up to date maintenance logs and other appropriate documentation detailing the Equipment's then current configuration (including a description of all replacements and additions thereto made during the Term of the Lease) and all operating requirements and technical data regarding the setup, use and operation of the Equipment;

(iv)      an in-depth field service report (the "Report") detailing the results of an inspection conducted by a representative of the manufacturer or a qualified equipment maintenance provider acceptable to Lessor certifying that the Equipment has been properly inspected, examined, tested and is operating within the manufacturer's specifications and addressing, at a minimum the following areas:

    (A)     comprehensive physical inspection;

    (B)     testing of all material and workmanship of the Equipment; and

    (C)     conformation of all Equipment operations to Applicable Law and confirming that the Equipment is otherwise in Average Saleable Condition (as hereinafter defined).

If the Report discloses that any of the material, workmanship or Equipment does not meet or, does not operate within, the manufacturer's specifications or any Applicable Law, Lessee shall, at its sole expense, take all necessary corrective measures and submit a second Report from the same inspector evidencing that the Equipment has been brought into conformity with the manufacturer's specifications and Applicable Law.

(c) "Average Saleable Condition" shall mean that all of the following minimum standards have been met:

_Plastic Molding Equipment_

    (i)   Heating, cooling and hydraulic components contain no system leaks.

    (ii)  All tanks and hoses are fluid tight.

    (iii) The Equipment housing is in good appearance and repair, and not dented or torn.

    (iv) The mechanical components of the Equipment will operate at the original manufacturer's specifications.

    (v)  All Equipment is free of decals and markings other than those affixed by the original manufacturer or at Lessor's direction.

    (vi) The Equipment is clean and in good appearance and any repair work or painting has been done in a professional manner.

    (vii) The Equipment is in suitable condition for immediate and continued use in service for the purposes for which it was designed and built.

    (viii)    The Equipment is assembled and ready for return with the same electrical wiring, appurtenances, software and auxiliary equipment as when first delivered.

(d) In addition to all other rights of Lessor under the Lease, Lessor shall have the right to attempt to resell or auction the Equipment from Lessee's facility with the Lessee's full cooperation and assistance, for a period commencing with Lessor's receipt of the Return Notice and ending one hundred eighty (180) days after the Initial Term Expiration Date. Lessee agrees to pay the reasonable costs and expenses of such sale or auction (and all storage prior thereto), and agrees that the Equipment shall remain capable of operation during this period. Lessee shall provide adequate electrical power, lighting, heat, water and all other requirements sufficient to allow for normal maintenance and for demonstrations of the Equipment to any potential buyer.

    12.     GOVERNING LAW. This Schedule is being delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance without giving effect to any choice of law or conflict of laws provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

JAN-25-2005  12:43      CENTER CAPITAL                  860 677 1888      P.05

13.    COUNTERPARTS. This Schedule may be executed in any number of counterparts, each executed counterpart constituting an original but all together one and the same instrument.

14.    MORE THAN ONE LESSEE. If more than one person or entity executes this Schedule, or any other Lease Documents executed in connection herewith, as "Lessee," the obligations of "Lessee" contained herein and therein shall be deemed joint and several and all references to "Lessee" shall apply both individually and jointly.

15.    RELATIONSHIP TO MASTER LEASE; FURTHER ASSURANCES. This Schedule shall be construed in connection with and as part of this Lease, and all terms contained in the Master Lease are hereby incorporated herein by reference with the same force and effect as if such terms were fully stated herein. By execution of this Schedule, Lessee and Lessor reaffirm all terms of the Master Lease except as they may be modified hereby. To the extent that any of the terms of this Schedule are contrary to or inconsistent with any terms of the Master Lease, the terms of this Schedule shall govern. LESSEE HEREBY CERTIFIES TO LESSOR THAT THE REPRESENTATIONS AND WARRANTIES MADE BY LESSEE IN THE MASTER LEASE (INCLUDING, WITHOUT LIMITATION, SECTION 31 THEREOF) ARE TRUE AND CORRECT IN ALL MATERIAL RESPECTS AS OF THE DATE OF THIS SCHEDULE WITH THE SAME EFFECT AS THOUGH MADE ON AND AS OF SUCH DATE. Lessee shall take such additional actions and execute and deliver such additional documents as Lessor shall deem necessary from time to time to effectuate the terms of this Lease.

16.    POWER OF ATTORNEY. LESSEE HEREBY APPOINTS LESSOR OR ITS ASSIGNEE AS ITS TRUE AND LAWFUL ATTORNEY IN FACT, IRREVOCABLY AND COUPLED WITH AN INTEREST, TO EXECUTE AND FILE ON BEHALF OF LESSEE ALL UCC FINANCING STATEMENTS WHICH IN LESSOR'S SOLE DISCRETION ARE NECESSARY OR PROPER TO SECURE LESSOR'S INTEREST IN THE EQUIPMENT IN ALL APPLICABLE JURISDICTIONS. Lessee hereby ratifies, to the extent permitted by law, all that Lessor shall lawfully and in good faith do or cause to be done by reason of and in compliance with this paragraph.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Schedule to be duly executed and delivered on the day and year first above written.

Lessor:                                    Lessee:

Center Capital Corporation                 AERO PLASTICS, INC.


By: _____                X _____
Name:        M. LONGASON                   Name:    Jeff Goldberg
Title:       V.P                           Title:   President


COUNTERPART NO. 1 OF 1 SERIALLY NUMBERED MANUALLY EXECUTED COUNTERPARTS. TO THE EXTENT THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST MAY BE CREATED THROUGH THE TRANSFER AND POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

JAN-25-2005  12:43        CENTER CAPITAL                    860 677 1888    P.06



# Exhibit A

## EQUIPMENT DESCRIPTION

**Lessor:**   Center Capital Corporation

**Lessee:**   AERO PLASTICS, INC.

**Lease:**    Equipment Schedule No. 2 dated as of December 2, 2002 to
              Master Equipment Lease Agreement Dated as of November 6, 2002

---

**Equipment**   Greenwood Industrial Park, Lot#9
**Location:**    McDonough, GA 30253
                Henry County

**Vendor:**     Nissei America, Inc.
                1480 North Hancock St.
                Anaheim, CA 92607

| Quantity: | Description: | VIN or Serial No. | Invoice No. |
|---|---|---|---|
| 3 | Nissei Plastic Injection Molding Machines | S46X008, S46X009, S46X010 | 112626 |
| | Model#: FN8000 (160AN1) | | |

*** End of Exhibit ***

"G"



C# 54474
L# 54475

## Personal Guaranty
### (Lease)

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and in order to induce **Key Equipment Finance, a Division of Key Corporate Capital Inc.** ("KEF") to make loans and extend credit to AERO PLASTICS, INC ("Lessee"), with its principal place of business at 163 Pioneer Drive, Leominster, MA 01453 providing for the financing of certain equipment (the "Equipment") the undersigned, Jeffrey S Goldberg, Jr ("Guarantor"), residing at the address listed below, hereby absolutely unconditionally and irrevocably guarantees to KEF the full and prompt payment and performance by Lessee of all Obligations (as that term is defined below), on the terms and conditions set forth in this Guaranty  Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing

1. **Definitions:** The following words shall have the following meanings in this Guaranty
   "Guaranty" means this Personal Guaranty made by Guarantor for the benefit of KEF
   "Lease Documents" shall have the meaning set forth in the Master Lease, or if not defined in the Master Lease, as used herein the term Lease Documents shall mean all documents prepared by Lessor and now or hereafter executed in connection with the Master Lease
   "Obligations" means the liability of Guarantor hereunder for the obligations of Lessee under the Lease Documents, including, without limitation, the payment when due of all Rent and all other sums currently now hereafter owing by Lessee to KEF thereunder, including costs, expenses and attorneys fees incurred by KEF in connection therewith
   "Other Guarantor" means any other guarantor of the Obligations
   "Other Guarantees" means any guaranty by any Other Guarantor

   Capitalized terms not otherwise defined herein have the meaning given in the Master Equipment Lease Agreement between KEF as Lessor and Lessee dated as of November 6, 2002 (the "Master Lease")

2. **Nature of Guaranty.** Guarantor's liability under this Guaranty shall be absolute, primary and direct  Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Obligations  KEF shall not be required to pursue any right or remedy it may have against Lessee under the Lease Documents or otherwise (and shall not be required first to commence any action or obtain any judgment against Lessee) before enforcing this Guaranty against Guarantor

3. **Guarantor's Representations and Warranties.** Guarantor warrants and represents to KEF that (a) the execution, delivery and performance of this Guaranty will not result in a breach of, or constitute a default under, or result in the creation of any security interest, lien, charge or encumbrance upon any property or assets of Guarantor pursuant to any loan agreement, indenture or contract to which Guarantor is a party to by or under which it is bound, (b) this Guaranty is executed at Lessee's request and not at the request of KEF, (c) Guarantor is a shareholder of Lessee and the lease of the Equipment to be made by KEF to Lessee will result in a direct or indirect material economic benefit to Guarantor, (d) KEF has made no representation to Guarantor as to the creditworthiness of Lessee, (e) Guarantor has means to and shall keep adequately informed regarding Lessee's financial condition and KEF shall have no obligation to disclose to Guarantor any information regarding Lessee

4. **Guarantor Waivers.** Guarantor expressly waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Lessee, the Guarantor or both, in any action or proceeding, in any court, arising on, out of, under, by virtue of, or in any way relating to the Lease Documents, this Guaranty or the transactions contemplated thereby or hereby  Guarantor agrees that this Guaranty shall be valid, enforceable and unconditionally binding upon Guarantor regardless of (a) the reorganization, merger or consolidation of Lessee into or with another entity, corporate or otherwise, or the sale or other disposition of all or substantially all of the capital stock, business or assets of Lessee to any other person or party, (b) the death or dissolution of Lessee, Guarantor or



EXHIBIT
G

any Other Guarantor, (c) the voluntary or involuntary bankruptcy (including a reorganization in bankruptcy) of Lessee, Guarantor or any Other Guarantor, (d) the granting by KEF of any indulgences or extensions to Lessee, Guarantor or any Other Guarantor, (e) the assertion by KEF against Lessee, Guarantor or any Other Guarantor of any of KEF's rights and remedies provided for under the Lease Documents or existing in its favor in law, equity or bankruptcy, (f) the release of Lessee, Guarantor or any Other Guarantor from any Obligations under the Lease Documents, this Guaranty or any Other Guarantees by KEF or by operation of law or otherwise, (g) any invalidity, irregularity, defect or unenforceability of any provision of any of the Lease Documents, this Guaranty or any Other Guarantees, (h) any defenses given to guarantors at law or in equity other than actual payment and performance of the Obligations, or (i) the destruction, sale, modification or alteration of any item of the Equipment

Guarantor hereby waives notice of and consents to (a) the financing by Lessee of the Equipment, and to any subleasing or other use of the Equipment permitted by KEF (regardless of who any such sublessee or user may be), (b) all of the provisions of the Lease Documents, and any amendments, qualifications and extensions thereof, and any actions taken thereunder, and (c) the execution by Lessee of the foregoing documents and of any other agreements, documents and instruments executed by Lessee in connection therewith  Guarantor further waives notice of KEF's acceptance of this Guaranty, of any default and non-payment and/or non-performance by Lessee under the Lease Documents, of presentment, protest and demand, and of all other matters to which Guarantor might otherwise be entitled  Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any renewal, modification or extension of the term of the Lease Documents or of the terms and conditions of the Lease Documents  Guarantor hereby expressly waives all notice of and consents to any such renewal, modification or extension and to the execution by Lessee of any documents pertaining to any such renewal, modification or extension  GUARANTOR CONFIRMS THAT THE FOREGOING WAIVER IS INFORMED AND VOLUNTARY

5.     **KEF Waiver.**  KEF shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by KEF  No delay or omission on the part of KEF in exercising any right shall operate as a waiver of such right or any other right  Guarantor hereby agrees that the failure of KEF to insist in any one or more instances upon a strict performance or observance of any of the terms, provisions or covenants of this Guaranty or the Lease Documents, or to exercise any of its rights thereunder or hereunder, shall not be construed or deemed to be a waiver or relinquishment for the future of any such terms, provisions, covenants or rights, but such terms, provisions, covenants and rights shall continue and remain in full force and effect and shall be enforceable under this Guaranty  No delay or failure by KEF to exercise any right or remedy against Lessee or any Other Guarantor will be construed as a waiver of that right or remedy or as a waiver of any right or remedy against Guarantor  All remedies of KEF against the Lessee, Guarantor and the Other Guarantors are cumulative  Receipt by KEF of any payments or other sums payable under the Lease Documents with knowledge that Lessee has breached any of the terms, provisions or covenants of the Lease Documents shall not be deemed to be a waiver by KEF of such breach, or a release or relinquishment of any claim for future performance under the Lease Documents or this Guaranty

6.     **Subordination/Subrogation.**  Guarantor specifically waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which the Guarantor may now or hereafter have against the Lessee or any other person or entity directly or contingently liable for the Obligations guaranteed hereunder, or against or with respect to the Lessee's property (including, without limitation, property collateralizing the Lease Documents), arising from the existence or performance of this Guaranty

The liability of Guarantor under this Guaranty, and of any Other Guarantors, if any, under Other Guarantees given in favor of KEF in connection with the Lease Documents, shall be joint and several and shall be irrevocable, unconditional and absolute, continuing in full force and effect according to its terms, until all of the Obligations hereby guaranteed have been fully satisfied  Guarantor covenants and agrees that any indebtedness of Lessee to Guarantor is hereby subordinated to the obligations of Lessee to KEF, and that after any default under the Lease Documents or any of the other documents evidencing the transactions contemplated hereby, Guarantor shall hold any funds received from Lessee in trust for KEF to satisfy the obligations of Lessee to KEF and shall forthwith deliver such funds to KEF in the form received  This subordination of the indebtedness and other obligations shall continue until all of the Obligations have been paid, performed and satisfied in full

7.     **Assignment**  This Guaranty is assignable by KEF without notice to Guarantor and Guarantor consents thereto  Guarantor's obligations under this Guaranty may not be delegated to any other person or entity without the prior written

consent of KEF  Any assignee of KEF shall have all of the rights of KEF hereunder and may enforce this Guaranty against Guarantor with the same force and effect as if this Guaranty were given to such assignee in the first instance  This Guaranty shall inure to the benefit of KEF, and its successors and assigns, and shall be binding upon Guarantor and its heirs, administrators, successors and assigns

8.  **Severability/Governing Law**  If any provision of this Guaranty is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent that it is not prohibited or unenforceable, nor invalidate the other provisions hereof, all of which shall be construed liberally in favor of KEF in order to effect the provisions hereof  This Guaranty shall be governed by and construed in accordance with the laws of the state of New York, without regard to any conflicts of laws principles of such state  Guarantor agrees to pay upon demand all of KEF's costs and expenses, including reasonable attorneys' fees and court costs, in enforcing payment under this Guaranty, or in the prosecution or defense of any action or proceeding by or against KEF or the Guarantor concerning any matter arising out of or connected herewith, including without limitation any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code

9.  **Jury Trial Waiver.** GUARANTOR HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS GUARANTY, THE LEASE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH GUARANTOR MAY BE A PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THE LEASE DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY GUARANTOR WHO ACKNOWLEDGES THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS GUARANTY OR THE LEASE DOCUMENTS.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the ____ (Day) day of _____ (Month), _____ (Year)

Jeffrey S Goldberg Jr

_Jeffrey S Goldberg_ (signature)

Guarantor's Residence Address  _20 Montrose Street_
_Newton MA 02458_

Guarantor's SS#  _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_

STATE OF  _MA_                    )
                                 ) ss
COUNTY OF  _Worcester_           )

On this _8_ (Day) day of _November_ (Month), _2003_ (Year), before me the subscriber personally appeared _Jeff Goldberg_, who being by me duly sworn, did depose and say, that he/she resides at _20 montrose st newton MA_ he/she is the person described in and who executed the foregoing instrument, and that he/she signed his name thereto _____ that freely and of his/her own volition

_Lynn Briggs_ (signature)
NOTARY PUBLIC

My Commission Expires

LYNN M BRIGGS
Notary Public
My Commission Expires
August 23  2007

"H"



C#: 54474
L#: 54475

## Corporate Guaranty
### (Lease)

**FOR GOOD AND VALUABLE CONSIDERATION,** the receipt and sufficiency of which are hereby acknowledged, and in order to induce **Key Equipment Finance, a Division of Key Corporate Capital Inc.** ("KEF") to make loans and extend credit to AERO PLASTICS, INC. ("Lessee"), with its principal place of business at 163 Pioneer Drive, Leominster, MA 01453 providing for the financing of certain equipment (the "Equipment") the undersigned, Aero Realty Trust ("Guarantor"), with its principal place of business at _163 Pioneer Drive_, _Leominster MA_, hereby absolutely unconditionally and irrevocably guarantees to KEF the full and prompt payment and performance by Lessee of all Obligations (as that term is defined below), on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.

1. **Definitions:** The following words shall have the following meanings in this Guaranty:
    "Guaranty" means this Corporate Guaranty made by Guarantor for the benefit of KEF.
    "Lease Documents" shall have the meaning set forth in the Master Lease, or if not defined in the Master Lease, as used herein the term Lease Documents shall mean all documents prepared by Lessor and now or hereafter executed in connection with the Master Lease.
    "Obligations" means the liability of Guarantor hereunder for the obligations of Lessee under the Lease Documents, including, without limitation, the payment when due of all Rent and all other sums currently or hereafter owing by Lessee to KEF thereunder, including costs, expenses and attorneys fees incurred by KEF in connection therewith.
    "Other Guarantor" means any other guarantor of the Obligations.
    "Other Guarantees" means any guaranty by any Other Guarantor.

Capitalized terms not otherwise defined herein have the meaning given in the Master Equipment Lease Agreement between KEF as Lessor and Lessee dated as of November 6, 2002 (the "Master Lease").

2. **Nature of Guaranty.** Guarantor's liability under this Guaranty shall be absolute, primary and direct. Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Obligations. KEF shall not be required to pursue any right or remedy it may have against Lessee under the Lease Documents or otherwise (and shall not be required first to commence any action or obtain any judgment against Lessee) before enforcing this Guaranty against Guarantor.

3. **Guarantor's Representations and Warranties.** Guarantor warrants and represents to KEF that (a) the execution, delivery and performance of this Guaranty will not result in a breach of, or constitute a default under, or result in the creation of any security interest, lien, charge or encumbrance upon any property or assets of Guarantor pursuant to any loan agreement, indenture or contract to which Guarantor is a party or by or under which it is bound; (b) this Guaranty is executed at Lessee's request and not at the request of KEF; (c) Lessee is an affiliated entity of Guarantor and the lease of Equipment to be made by KEF to Lessee will result in a direct or indirect material economic benefit to Guarantor; (d) KEF has made no representation to Guarantor as to the creditworthiness of Lessee; (e) Guarantor has means to and shall keep adequately informed regarding Lessee's financial condition and KEF shall have no obligation to disclose to Guarantor any information regarding Lessee.

4. **Guarantor Waivers.** Guarantor expressly waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Lessee, the Guarantor or both, in any action or proceeding, in any court, arising on, out of, under, by virtue of, or in any way relating to the Lease Documents, this Guaranty or the transactions contemplated thereby or hereby. Guarantor agrees that this Guaranty shall be valid, enforceable and unconditionally binding upon Guarantor regardless of: (a) the

**EXHIBIT**

H

reorganization, merger or consolidation of Lessee into or with another entity, corporate or otherwise, or the sale or other disposition of all or substantially all of the capital stock, business or assets of Lessee to any other person or party; (b) the death or dissolution of Lessee, Guarantor or any Other Guarantor; (c) the voluntary or involuntary bankruptcy (including a reorganization in bankruptcy) of Lessee, Guarantor or any Other Guarantor; (d) the granting by KEF of any indulgences or extensions to Lessee, Guarantor or any Other Guarantor; (e) the assertion by KEF against Lessee, Guarantor or any Other Guarantor of any of KEF's rights and remedies provided for under the Lease Documents or existing in its favor in law, equity or bankruptcy; (f) the release of Lessee, Guarantor or any Other Guarantor from any Obligations under the Lease Documents, this Guaranty or any Other Guarantees by KEF or by operation of law or otherwise; (g) any invalidity, irregularity, defect or unenforceability of any provision of the Lease Documents, this Guaranty or any Other Guarantees; (h) any defenses given to guarantors at law or in equity other than actual payment and performance of the Obligations; or (i) the destruction, sale, modification or alteration of any item of the Equipment.

Guarantor hereby waives notice of and consents to (a) the financing by Lessee of the Equipment, and to any subleasing or other use of the Equipment permitted by KEF (regardless of who any such sublessee or user may be), (b) all of the provisions of the Lease Documents, and any amendments, qualifications and extensions thereof, and any actions taken thereunder, and (c) the execution by Lessee of the foregoing documents and of any other agreements, documents and instruments executed by Lessee in connection therewith. Guarantor further waives notice of KEF's acceptance of this Guaranty, of any default and non-payment and/or non-performance by Lessee under the Lease Documents, of presentment, protest and demand, and of all other matters to which Guarantor might otherwise be entitled. Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any renewal, modification or extension of the term of the Lease Documents or of the terms and conditions of the Lease Documents. Guarantor hereby expressly waives all notice of and consents to any such renewal, modification or extension, and to the execution by Lessee of any documents pertaining to any such renewal, modification or extension. GUARANTOR CONFIRMS THAT THE FOREGOING WAIVER IS INFORMED AND VOLUNTARY.

5. __KEF Waiver.__ KEF shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by KEF. No delay or omission on the part of KEF in exercising any right shall operate as a waiver of such right or any other right. Guarantor hereby agrees that the failure of KEF to insist in any one or more instances upon a strict performance or observance of any of the terms, provisions or covenants of this Guaranty or the Lease Documents, or to exercise any of its rights thereunder or hereunder, shall not be construed or deemed to be a waiver or relinquishment for the future of any such terms, provisions, covenants or rights, but such terms, provisions, covenants and rights shall continue and remain in full force and effect and shall be enforceable under this Guaranty. No delay or failure by KEF to exercise any right or remedy against Lessee or any Other Guarantor will be construed as a waiver of that right or remedy or as a waiver of any right or remedy against Guarantor. All remedies of KEF against the Lessee, Guarantor and the Other Guarantors are cumulative. Receipt by KEF of any payments or other sums payable under the Lease Documents with knowledge that Lessee has breached any of the terms, provisions or covenants of the Lease Documents shall not be deemed to be a waiver by KEF of such breach, or a release or relinquishment of any claim for future performance under the Lease Documents or this Guaranty.

6. __Subordination/Subrogation.__ Guarantor specifically waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which the Guarantor may now or hereafter have against the Lessee or any other person or entity directly or contingently liable for the Obligations guaranteed hereunder, or against or with respect to the Lessee's property (including, without limitation, property collateralizing the Lease Documents), arising from the existence or performance of this Guaranty.

The liability of Guarantor under this Guaranty, and of any Other Guarantors, if any, under Other Guarantees given in favor of KEF in connection with the Lease Documents, shall be joint and several and shall be irrevocable, unconditional and absolute, continuing in full force and effect according to its terms, until all of the Obligations hereby guaranteed have been fully satisfied. Guarantor covenants and agrees that any indebtedness of Lessee to Guarantor is hereby subordinated to the obligations of Lessee to KEF, and that after any default under the Lease Documents or any of the other documents evidencing the transactions contemplated hereby, Guarantor shall hold any funds received from Lessee in trust for KEF to satisfy the obligations of Lessee to KEF and shall forthwith deliver

such funds to KEF in the form received. This subordination of the indebtedness and other obligations shall continue until all of the Obligations have been paid, performed and satisfied in full.

7.    **Assignment**. This Guaranty is assignable by KEF without notice to Guarantor and Guarantor consents thereto. Guarantor's obligations under this Guaranty may not be delegated to any other person or entity without the prior written consent of KEF. Any assignee of KEF shall have all of the rights of KEF hereunder and may enforce this Guaranty against Guarantor with the same force and effect as if this Guaranty were given to such assignee in the first instance. This Guaranty shall inure to the benefit of KEF, and its successors and assigns, and shall be binding upon Guarantor and its heirs, administrators, successors and assigns.

8.    **Severability/Governing Law**. If any provision of this Guaranty is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent that it is not prohibited or unenforceable, nor invalidate the other provisions hereof, all of which shall be construed liberally in favor of KEF in order to effect the provisions hereof. This Guaranty shall be governed by and construed in accordance with the laws of the state of New York, without regard to any conflicts of laws principles of such state. Guarantor agrees to pay upon demand all of KEF's costs and expenses, including reasonable attorneys' fees and court costs, in enforcing payment under this Guaranty, or in the prosecution or defense of any action or proceeding by or against KEF or the Guarantor concerning any matter arising out of or connected herewith, including without limitation any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code.

9.    **Jury Trial Waiver**. GUARANTOR HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS GUARANTY, THE LEASE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH GUARANTOR MAY BE A PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THE LEASE DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY GUARANTOR WHO ACKNOWLEDGES THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS GUARANTY OR THE LEASE DOCUMENTS.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the _6th_ (Day) day of _December_ (Month), _2002_ (Year).

Aero Realty Trust

X _Jeff Spilling_
Name: _Jeff Geralics_
Title: _President_

"I"



## Subordination Agreement
### Dated as of November 6, 2002

WHEREAS, Jeffrey S. Goldberg, Jr. ("Creditor") is a creditor of Aero Plastics, Inc. ("Debtor") for monies justly due and owing and presently payable to Creditor from the Debtor which are secured by a lien (the "Creditor Security Interest") on all of the assets of Debtor (the "Collateral"), and

WHEREAS, the Debtor desires, and has requested Key Equipment Finance, a Division of Key Corporate Capital Inc ("KEF"), to enter into one or more equipment financing transactions to be evidenced by a lease agreement, promissory note or other evidence of indebtedness, or to otherwise extend credit to the Debtor (each a "Financing"), and in consideration of such advances, and to secure and protect the repayment of any equipment financing or other extension of credit so made or indebtedness so extended, the Creditor has entered into and delivered this Agreement to, and for the benefit of, KEF

NOW, THEREFORE, for value received and as an inducement to KEF to enter into one or more Financings or otherwise extend credit to the Debtor, or to extend the maturity date of any existing indebtedness owed from the Debtor to KEF, and in consideration of any equipment financing or other extension of credit so made by KEF to the Debtor or the extension of maturity of any existing indebtedness now owing from the Debtor to KEF, the Creditor agrees that

1  The Creditor Security Interest, and any other security interest of the Creditor in any equipment that is the subject of a Financing (the "Equipment") and in any proceeds arising out of the sale, lease or other disposition of the Equipment, shall be subordinate and junior to KEF's interest in such Equipment and in any proceeds arising out of any sale, lease or other disposition thereof  This subordination shall apply irrespective of the time or order of attachment or perfection of the Creditor Security Interest in the Equipment and shall remain in full force and effect (i) so long as KEF its successors and assigns are owed any sums arising out of or related to the Financing or the Equipment and (ii) regardless of whether the Creditor or KEF may seek to rescind, amend, terminate, or reform, by litigation or otherwise, its respective agreements with the Debtor

2  Borrower may make regularly scheduled payments of principal and interest to Creditor, *provided, however,* that in the event that a Debtor default or event of default occurs or continues under a Financing, any and all indebtedness and other liabilities of the Debtor to the Creditor now existing or hereafter created shall be postponed and subordinated to the prior payment and satisfaction in full of any and all indebtedness and other liabilities of the Debtor to KEF, both those now existing and those hereafter incurred, and any renewals or extensions thereof and, in such event, any and all of such liabilities of, and indebtedness of, the Debtor to KEF shall be fully paid and discharged together with all interest thereon and expenses (including attorney's fees) of collecting the same before any payment shall be accepted from or required of the Debtor on account of any indebtedness or other liabilities of the Debtor to the Creditor

3  If a Debtor default or event of default has occurred or is continuing under a Financing, Creditor will not bring any suit or action to enforce the payment of such indebtedness or other liabilities from the Debtor to the Creditor, or to foreclose upon or recover any Collateral, until the entire indebtedness and other liabilities of the Debtor to KEF, together with expenses as aforesaid, have been satisfied in full  KEF may intervene in any suit or action brought by the undersigned in violation of this Agreement and interpose this Agreement as a bar to such suit or action  The Debtor may also interpose this Agreement as a bar to any suit or action brought by the Creditor in violation hereof

4  This Agreement and the postponement and subordination provided for herein shall be equally effective in the event of any administration of the property or affairs of the Debtor arising from or in connection with



**EXHIBIT**

I

bankruptcy, reorganization, arrangement, receivership, liquidation, assignment or other like judicial or non-judicial proceedings

5   KEF may assign its rights hereunder to any person or entity ("Assignee") and that the Creditor Security Interest shall be subordinate and junior to the interest of any such Assignee   The Creditor shall not assign or transfer to others any claim the Creditor has or may have against the Debtor while the liabilities remain unpaid, unless such assignment or transfer is made expressly subject to this Agreement

6   This Agreement shall be binding upon the Creditor, its successors and assigns, and shall be construed in accordance with the laws of the State of New York without giving effect to any conflict of laws provisions thereof

   **IN WITNESS WHEREOF,** the Creditor has executed, or has caused this Agreement to be executed, as of the day and year first above written

Jeffrey S. Goldberg, **K.**

By _____
Title
Date

---

## Affirmation of Debtor

   Debtor, hereby represents and warrants as of the date first written above that (i) it is indebted to the Creditor, (ii) it has received notice and a copy of this Agreement, (iii) until notice is received by it from KEF of the termination of this Agreement, or until such time as it shall have satisfied in full any and all indebtedness and other liabilities to KEF, it will not (except as expressly provided for in this Agreement) directly or indirectly, except with the prior written consent of KEF, make or effect any payments on any indebtedness or liability subordinated by the terms of this Agreement, and (iv) it will give KEF prompt written notice of any suit or action brought in violation of the Agreement

   **IN WITNESS WHEREOF,** the Debtor has executed, or has caused this Agreement to be executed, as of the day and year first above written

Aero Plastics, Inc.

By _____
Title
Date

"J"

JAN-25-2005  12:43     CENTER CAPITAL                    860 677 1808    P.07

C#: 54474
L#: 54475
Ls#: 8800022311

**THIS IS A CERTIFICATE ACKNOWLEDGING
ACCEPTANCE OF THE EQUIPMENT FOR
PURPOSES OF THE BELOW-REFERENCED LEASE.**

**THIS IS NOT A DELIVERY RECEIPT.**

### LESSEE ACKNOWLEDGMENT
(Certificate of Acceptance)

Lessee Name:  AERO PLASTICS, INC.

All the items of Equipment covered by Equipment Schedule 02 to Master Equipment Lease Agreement dated as of November 6, 2002 (the "Lease") between Center Capital Corporation, as lessor ("CCC"), and the undersigned, as lessee, (a) were received by the undersigned, (b) are satisfactory to the undersigned in all respects and are acceptable to the undersigned for lease under the Lease, (c) are suitable for the undersigned's purposes, (d) are in good order, repair and condition, (e) have been installed and operate properly, and (f) are subject to all of the terms and conditions of the Lease (including, without limitation, Section 3 thereof).

To the extent that Article 2A ("Article 2A") of the Uniform Commercial Code ("UCC") applies to the characterization of the Lease, the undersigned hereby agree(s) that the Lease is a "Finance Lease" as defined therein. The undersigned acknowledge(s): (i) that the undersigned has selected the "Supplier" (as defined in the UCC) and has directed CCC to purchase the Equipment from the Supplier in connection with the Lease, and (ii) that the undersigned has been informed in writing in the Lease, before the undersigned's execution thereof, that the undersigned is entitled under Article 2A to the promises and warranties, including those of any third party, provided to CCC by the Supplier in connection with or as part of the Purchase Agreement (as defined in the Lease), and that the undersigned may communicate with the Supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies.

Dated: __12/20_____, 2002 (Year)

AERO PLASTICS, INC.

X _____
Name: _____
Title: _____

EXHIBIT
J

"K"

## Notice and Acknowledgement of Assignment

December 19, 2002

ANDY RICE
AERO PLASTICS, INC.
163 Pioneer Drive
Leominster, MA 01453]

Reference is hereby made to that certain Master Equipment Lease Agreement dated as of November 6, 2002 (the "Master Lease"), between KEY EQUIPMENT FINANCE, A DIVISION OF KEY CORPORATE CAPITAL, INC., ("Original Lessor") and AERO PLASTICS, INC ("Lessee"); and that certain Corporate Guaranty, AERO REALTY TRUST dated December 18, 2002 and that certain Personal Guaranty, JEFFREY S. GOLDBERG (collectively, the "Guarantor"), dated as of November 8, 2002 (collectively, the "Guaranty"), in favor of Lessor.

Original Lessor hereby notifies Lessee and Guarantor, and Lessee and Guarantor hereby acknowledge receipt of notice, that Original Lessor has assigned to CENTER CAPITAL CORPORATION, ("Assignee"), whose offices are at 4 Farm Springs Road, Farmington, CT 06032, all right, title and interest (on a going forward basis only) of Original Lessor in and to (a) Equipment Schedule No. 02 dated December 2, 2002 which shall be executed by Assignee as lessor (the "Designated Schedule"), (b) solely to the extent incorporated in the Designated Schedule by reference, the Master Lease, and (c) solely to the extent related to the Designated Schedule, the Guaranty. From and after the date of this Notice, Lessee agrees to make payment of any and all monies due or to become due under the Designated Schedule to Assignee as directed by Assignee and Guarantor agrees to make payment of any and all monies due or to become due under the Guaranty (solely to the extent related to the Designated Schedule) to Assignee as directed in writing by Assignee.

Accepted and agreed to on this __23__ day of December, 2002.

Original Lessor:
Key Equipment Finance, a Division of
Key Corporate Capital Inc.

By: _____
Name:
Title:
Guarantor:
**Sandra L. Costanzo**
**Regional Business**
**Unit Manager**
Aero Realty Trust

x _____
Name: Jeff Goldberg
Title: Trustee

Lessee:
Aero Plastics, Inc.

x _____
Name: Jeff Goldberg
Title: President
Guarantor:

Jeffrey S. Goldberg

x _____

**EXHIBIT**

**K**

"L"

## Third Amendment and Restatement of Lease Agreement

THIS AMENDMENT AND RESTATEMENT AGREEMENT (this "Amendment"), executed and effective as of September 30, 2004, is entered into by and between the parties signing this Amendment, and is intended to modify certain terms and conditions of that Loan/Lease agreement referred to below. The terms of the Loan/Lease agreement referred to below are incorporated herein and made a part hereof by reference. In connection with this Amendment, the parties hereto agree as follows:

DESCRIPTION OF LOAN/LEASE AGREEMENT:     Master Equipment Lease Agreement dated as of November 6, 2002; Amendment No. 01 to Master Lease Equipment Lease Agreement dated as of November 6, 2002 and Amendment No. 02 to Master Equipment Lease Agreement dated December 10, 2002 . (This Loan/Lease Agreement is referred to as the "Agreement".)

DESCRIPTION OF LOAN SCHEDULE/LEASE SCHEDULE/PROMISSORY NOTE, ETC.:     Equipment Schedule No. 2 dated as of December 2, 2002. (This Loan Schedule/Lease Schedule/Promissory Note or other evidence of indebtedness is referred to as the "Payment Agreement".)

[The Agreement and the Payment Agreement (if any) are referred to, collectively, as the "Contract".]

PARTIES TO THE AGREEMENT AND THE PAYMENT AGREEMENT:

> Secured Party/Lessor:  Center Capital Corporation  ("CCC")

> Borrower/Lessee:  Aero Plastics, Inc. ("Debtor")

Notwithstanding any of the terms of the Contract to the contrary, CCC and Debtor hereby agree to modify said Contract, or to clarify certain of the terms thereof, as follows:  it is agreed that the Net Book Balance is Six Hundred Seventy-Five Thousand, Five Hundred Five Dollars and 38/100 Cents ($675,505.38). To this is being added late charges in the amount of Four Thousand, Nine Hundred Ninety-Nine Dollars and 37/100 Cents ($4,999.37) and property taxes in the amount of Six Thousand, Five Hundred Thirty-One Dollars and 31/100 Cents ($6,531.31) for an aggregate book balance of Six Hundred Eighty-Seven Thousand, Thirty-Six Dollars and 06/100 Cents ($687,036.06) which will be repaid in Fifty-Five (55) consecutive monthly rental payments as follows:  Three (3) monthly rental payments at Zero Dollar and 00/100 Cent ($0.00) plus any applicable sales or use tax; followed by Fifty-Two (52) monthly rental payments in the amount of Twelve Thousand, Two Hundred Twelve Dollars and 42/100 Cents ($12,212.42) plus any applicable sales or use tax commencing on October 1, 2004, with the final payment (plus all other amounts, if any, accruing under the terms of the contract) being due on April 1, 2009. The Purchase Option plus any sales or use tax will be due on May 1, 2009. (Note: None of the figures shown above shall constitute a payoff figure.)

In all other respects the Contract is hereby ratified and confirmed, and the parties agree that the same remains in full force and effect, the only revisions thereto being those expressly shown above. Terms used herein as defined terms but without the benefit of being defined shall have the meanings ascribed to such terms in the Contract.

The below-named guarantor(s) (if any) of Debtor's obligations under the Contract (the "Guarantor(s)") agree that by signing below, they shall be deemed to have ratified and confirmed the existence of their respective guaranties, and to have amended each such Guaranty to expressly guarantee all of the obligations and liabilities of Debtor under the Contract as it has been modified hereby.



EXHIBIT

L

Intending to be legally bound, the parties have executed this Amendment.

CENTER CAPITAL CORPORATION

By:

Title: **MEG LENGSON**
        Vice President

Date:  11-23-04

AERO PLASTICS, INC.  ("Debtor")

By: X

Jeffrey Goldberg

Title:  President

Date: X

X

Jeffrey Goldberg ("Personal Guarantor")

AERO REALTY TRUST ("Corporate Guarantor")

X

By: Jeffrey Goldberg

Its:  President

MA SOC   Filing   umber: 200216966390   Date: 12/16/20   12:42:00 PM

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

*Nota See*

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
| Phone 800-331-3282       Fax: 818-662-4141 |

MASSACK@LEXISNEXIS.COM

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

UCC Direct Services

P.O. Box 29071                    0094020018957001

Glendale, CA 91209-9071

File with: MASSACHUSETTS

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Aero Plastics, Inc. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 163 Pioneer Drive | LEOMINSTER | MA | 01453 | |
| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION MA | 1g. ORGANIZATIONAL ID #, if any 043057384   ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any   ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)   ☐ NONE

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Center Capital Corporation | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4 Farm Springs Road | Farmington | CT | 06032 | |

4. This FINANCING STATEMENT covers the following collateral:

This financing statement covers all of Lessee's right, title and interest, now owned or hereafter acquired, in and to the following described equipment, together with any and all (1) substitutions, replacements or exchanges therefore, (2) replacement parts, additions, attachments and accessories incorporated therein or affixed thereto, or used in connection therewith, and (3)cash and non cash proceeds including, without limitation, claims of the Debtor against third parties for loss or damage to, or destruction of, such equipment:

Equipment    Greenwood Industrial Park, Lot#9
Location:    McDonough, GA  30253
Henry County
Vendor :   Nissei America, Inc.
1480 North Hancock St.
Anaheim, CA  92607
Quantity:   Description:
3    Nissei Plastic Injection Molding Machines
Model#: FN8000 (160AN1)

Equipment Schedule No. 02

Lessee has no right to dispose of the equipment.

Continued on addendum.

| 5. ALTERNATIVE DESIGNATION [if applicable] | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

1705434-1 ()

ACKNOWLEDGMENT COPY - NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

Prepared by UCC Direct Services, P.O. Box 29071, Glendale, CA 91209-9071. Tel (800) 331-3282

# FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

9a. ORGANIZATION'S NAME

Aero Plastics, Inc.

OR

9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX

10. MISCELLANEOUS

**0094020018957001**

File with: MASSACHUSETTS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

11a. ORGANIZATION'S NAME

OR

11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

11d. TAX ID#: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | ☐ NONE

12. ☐ ADDITIONAL SECURED PARTY'S or ☒ ASSIGNOR S/P's NAME - insert only one name (12a or 12b)

12a. ORGANIZATION'S NAME

Key Equipment Finance

OR

12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

66 South Pearl Street | Albany | NY | 12207

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral or is filed as a ☐ fixture filing

14. Description of real estate:

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

16. Additional collateral description:

THIS FINANCING STATEMENT IS FILED SOLELY FOR NOTICE AND PRECAUTIONARY PURPOSES AND THE FILING HEREOF SHALL NOT BE DEEMED EVIDENCE OF ANY INTENTION OF THE PARTIES TO CREATE A SECURITY INTEREST UNDER THE UNIFORM COMMERCIAL CODE OR TO ENTER INTO ANY TRANSACTION OTHER THAN A TRUE LEASE TRANSACTION.

17. Check only if applicable and check only one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years

☐ Filed in connection with a Public-Finance Transaction — effective 30 years

Prepared by UCC Direct Services, Inc., P.O. Box 2907
Glendale, CA  91209-9071 Tel (800) 331-3282

# **CIVIL COVER SHEET (CONTINUED)**

I. (c) Attorney's (Firm Name, Address, and Telephone Number)

45 Milk Street, 7th Floor
Boston, MA 02109
(617) 778-7505

VI. CAUSE OF ACTION (cont.)

commercial loan agreement.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1.  Title of case (name of first party on each side only)   Center Capital Corporation v. Aero Realty Trust, et al.

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

___  I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

___  II.     195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,          *Also complete AO 120 or AO 121
X            740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.           for patent, trademark or copyright cases

___  III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

___  IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

___  V.      150, 152, 153.

3.  Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

    None

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                          YES ☐        NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

                                          YES ☐        NO ☒

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                          YES ☐        NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                          YES ☐        NO ☒

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                          YES ☐        NO ☒

    A.   If yes, in which division do all of the non-governmental parties reside?

         Eastern Division  ☐        Central Division  ☐        Western Division  ☐

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,  residing in Massachusetts reside?

         Eastern Division  ☒        Central Division  ☐        Western Division  ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

                                          YES ☐        NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME        Frank W. Beckstein III

ADDRESS Nelson, Kinder, Mosseau & Saturley, P.C. 45 Milk Street, 7th Floor, Boston, MA 02109

TELEPHONE NO.    617-778-7505

(CategoryForm[1].wpd - 10/17/02)

℀JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

FILED
IN CLERKS OFFICE

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

2005 FEB -3 P 3: 43

U.S. DISTRICT COURT
DISTRICT OF MASS.

## I. (a) PLAINTIFFS
Center Capital Corporation

Foreign, CT

**DEFENDANTS** Aero Realty Trust and
Jeffrey S. Goldberg, Individually and as
Trustee

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Frank W. Beckstein III, Nelson, Kinder,
Mosseau & Saturley, P.C. (cont.)

Attorneys (If Known)

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|

(For Diversity Cases Only)

| | | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|
| ❏ 1 | U.S. Government Plaintiff | ❏ 3 | Federal Question (U.S. Government Not a Party) | Citizen of This State | ❏ 1 | 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| ❏ 2 | U.S. Government Defendant | ☒ 4 | Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ❏ 2 | 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ❏ 5 |
| | | | | Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Med. Malpractice | ❏ 625 Drug Related Seizure | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | Liability | ❏ 365 Personal Injury - | of Property 21 USC 881 | | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 460 Deportation |
| & Enforcement of Judgment | Slander | ❏ 368 Asbestos Personal | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 470 Racketeer Influenced and |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Injury Product | ❏ 650 Airline Regs. | ❏ 830 Patent | Corrupt Organizations |
| ❏ 152 Recovery of Defaulted | Liability | Liability | ❏ 660 Occupational | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| Student Loans | ❏ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❏ 490 Cable/Sat TV |
| (Excl. Veterans) | ❏ 345 Marine Product | ❏ 370 Other Fraud | ❏ 690 Other | | ❏ 810 Selective Service |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 380 Other Personal | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Property Damage | Act | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ❏ 385 Property Damage | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Product Liability | ❏ 730 Labor/Mgmt.Reporting | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | | & Disclosure Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate | ❏ 790 Other Labor Litigation | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 442 Employment | Sentence | ❏ 791 Empl. Ret. Inc. | or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ | **Habeas Corpus:** | Security Act | ❏ 871 IRS—Third Party | ❏ 895 Freedom of Information |
| ❏ 240 Torts to Land | Accommodations | ❏ 530 General | | 26 USC 7609 | Act |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | | | ❏ 900 Appeal of Fee Determination |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ❏ 550 Civil Rights | | | to Justice |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | | | ❏ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ❏ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| ☒ 1 Original Proceeding | ❏ 2 Removed from State Court | ❏ 3 Remanded from Appellate Court | ❏ 4 Reinstated or Reopened | ❏ 5 Transferred from another district (specify) | ❏ 6 Multidistrict Litigation | ❏ 7 Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC Section 1332(a)

Brief description of cause:
Enforcement of personal guarantees regarding breached (cont.)

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  n

**DEMAND $** $731,981.08 +costs
and interest

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ❏ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):  JUDGE _____ DOCKET NUMBER _____

DATE 2/3/2005

SIGNATURE OF ATTORNEY OF RECORD _[signature]_

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____